JOHN L. LAWRENCE et al., as Surviving Executors, etc., Appel-
lants, *v.* JAMES M. WHITNEY et al., Respondents.

A dam had been constructed across the G. river for the purpose of fur-
nishing water power to the owner of lots below. The water retained
passed through guard-gates on each side of the river and reached the
mills run by it through a race. The lots adjoining the river on both
sides were, as conveyed by the original owners of the lands, bounded by
the river. Certain of the west-side owners, who owned in severalty, pur-
chased the lots on the east side, with a few exceptions, and entered into
an agreement between themselves which recited the purchase and the
several proportions in which they were entitled in severalty to use the
water, and declared the object of the purchase to be to prevent, as far as
they can, the "use of the water on the lands purchased." It then provided,
in substance, that each of the parties should be entitled to all his propor-
tion of the water on the lands purchased, through the west-side race, and
on his lot on that side, and that such rights should be perpetual. It also
preserved to each purchaser his existing rights of every kind unaffected
by the agreement. Some of said purchasers subsequently conveyed
their lots on the west side "with appurtenances." *Held*, that the agree-
ment did not have the effect to lawfully and perpetually divert from the
east-side lots the water right belonging to them, and attach it as an
appurtenance to the west-side lots, nor was any easement created for
their benefit; that the right to the water on any lot, following from title
to the bed of the stream to its center, was not an appurtenance to the land
of the shore, but was, in a legal sense, part of the lot itself, qualified by
the character of the property, so far as it consisted of a flowing stream;
that such part of the land could not be severed from the residue except
by deed, and no such deed working a severance was made, and no one
owner conveyed or granted any land or any easement in land to his
associates or either of them; and that, therefore, no portion of the east-
shore water right was conveyed by the word "appurtenances" in
the deed; nor could said grantees of the west-side lots enforce it as a
covenant, as such covenant was merely a personal one, not one run-
ning with the land.

One of the deeds of east-side lots contained a recital to the effect that
the object of the purchase was, "so far as may be practicable," to
increase the flow of water in the west-side race, the water rights of
which were held by the owners in severalty, and the purchasers cove-
nanted with each other that no one of them, his heirs or assigns, "will
sell or dispose of his or their interest in the premises, except to the suc-
cessor of the party in the ownership of his water lot or lots on the west
side, without the consent of two-thirds of the owners," the intention
being "that the ownership of a share in the property bought shall be

connected with and annexed, as far as practicable, to the ownership of a like share " of the west-side race. *Held,* that where one of the purchasers was at the time an owner of a west side lot, the covenants did not bar him from buying the shares of his associates in the power of the east-side lot and then using it on that side.

Subsequently, owners of west-side lots, taking power from the race on that side, entered into a contract with W., an owner of two east-side lots, which recited that the rights of the parties of the first part, the west-side owners, among themselves had been settled at seventy-nine parts, each part representing the power necessary to drive one run of stone, and that the object of the contract was to apportion the waters of the river between the west-side owners. It contained a provision that the rights and interests, as between themselves, were to be in no manner affected by the agreement. An estimate was then made of the water-power of the river, appertaining to or connected with the lots specified in the agreement, *i. e.,* the west-side lots of the parties of the first part and the east lots of W. at eighty-five parts, and gave to the east-side owners six of those parts. *Held,* that this was not an admission on the part of one of the parties of the first part that the water-power was stripped from the other east-side lots and attached to those on the west side; or that the power of the whole river was represented by eighty-five parts, seventy-nine of which belonged to the west-side owners, but that its sole effect was to limit, as against them, the amount of water to be drawn on the east side by W., and so it did not estop such owner who was or thereafter became the owner of east-side lots from claiming the water-power belonging to them.

Such owner accepted a quit-claim deed executed by an executor of his testator's interest in an east-side lot, which contained a clause excepting and reserving the testator's right at the time of his death "to the use of water originally belonging to land on the east side of the river, and made appurtenant to land on the west side, "*without prejudice to any rights*" the said owner then had. *Held,* that this did not estop the grantee from claiming the water rights belonging to his east-side lots, nor did it amount even to an admission.

(Argued June 14, 1889; decided October 8, 1889.)

APPEAL from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order made at the June term, 1887, which affirmed a judgment in favor of defendants, entered upon a decision of the court on trial at Special Term.

This action was brought to determine the rights of the parties in and to the water-power furnished by the Genesee

river at Rochester, and to restrain the defendants from drawing from the river more than the proportion alleged to belong to them of the water of said river.

The material facts are stated in the opinion.

*William F. Cogswell* for appellants. The deed from William H. Ward to Whitney did not take effect as against the parties to the agreement of 1866. (1 R. S. 737 m. p., § 137; *Gentes* v. *Morrison*, 31 Barb. 156; *Elsey* v. *Matcalf*, 1 Denio, 323.) The agreement of 1833 and the deed did not create a trust, and the fee passed directly to the beneficiaries. (1 R. S. 727, 728, 729, §§ 45, 55, 58.) The effect of the Pool judgment as a bar is limited to questions at issue in that case. (*Matthews* v. *Dwyer*, 45 Barb. 69; 4 Keyes, 525; *Perry* v. *Dickerson*, 85 N. Y. 345; *Emery* v. *Wilson*, 79 id. 78; *Palmer* v. *Hussey*, 87 id. 303.)

*Martin W. Cooke* for respondents. There is no question of estoppel under the facts. (*Reid* v. *McCavil*, 41 N. Y. 435, 438, 439; *Champlain R. R. Co.* v. *Valentine*, 19 Barb. 485, 488; *Edmonston* v. *Edmonston*, 13 Hun, 133, 136, 137.) The Pool judgment was a bar. (*Kickles* v. *Ritter*, 62 N. Y. 372; Freeman on Judg. § 330.)

FINCH, J. The controversy between these parties respects their relative rights to the use of the water of the Genesee river as power to drive their mills. A dam has been constructed across the river above the falls, and the waters retained by it pass through guard-gates on each side, and reach the mills through a race on the east bank of the river, and through what is called Brown's race on the west side; and the plaintiffs, who are a part of the proprietors drawing their water power from the latter race, claim to be entitled to the use of seventy-nine eighty-fifths of the water of the river, leaving to the owners on the east side only six eighty-fifths of the power stored by the dam. The fundamental proposition upon which this claim rests is that the predecessors of the plaintiffs,

who were at the time west-side owners, with mills located upon Brown's race, lawfully and perpetually diverted from the water lots on the east side of the river, and attached to the lots on Brown's race the whole water-right primarily belonging to the east-side except six eighty-fifths, and did this in such manner and so effectually that such added right became an integral part of the west-side right belonging or appurtenant to the lots on Brown's race, so that a conveyance of those lots with their water-right carried to the successive grantees the power diverted from the east side without further conveyance or specification. An examination of this claim has required in the court below and demands of us a construction of the deed and contracts upon which the plaintiffs rely, and an understanding of the titles on both sides of the river.

The common source of title seems to have been Moses Atwater, whose ownership extended along the east shore and covered the river to its center. His right to the water followed from his title to the bed of the stream. It was not an appurtenance to the land of the shore, but, in a legal sense, part of the land itself, and was embraced within the actual metes and bounds of his ownership. Of course, this right of his was qualified by the character of the property, so far as it consisted of a flowing stream. He was bound to deliver it at its proper level where it left his land to the proprietors below, and to use it without injury to those above. But, subject to these limitations, he had not an appurtenance to the lots on the banks, but the river itself, considered as power, by force of the ownership of its bed. We may now follow his conveyances on the east side. He began by a survey of the land and caused a map to be made, known as Hudson's map, which was filed in the clerk's office, and with reference to which his deeds were made. In the year 1819, and before the survey, Atwater had conveyed to Cleveland and Andrews what became by the map lot 16, which was separated from the brink of the falls only by a single lot, known as lot 15, which was afterward washed away and has substantially disappeared. This conveyance was by metes and bounds, and included no part of the

bed of the river. There was, however, upon the lot a grist-mill, and with the land was granted a right to draw sufficient water from a race on the Atwater tract to supply that mill. The water-right of the grantees, therefore, was simply an easement; a burden upon the ownership of Atwater for their benefit, and which was balanced by some rights of way and of occupation reserved to the grantor. The scope and extent of the Cleveland right appears to have been determined by the vice-chancellor in *Gibbs* v. *Whitney*, and was held to be measured by the necessities of the grist-mill as it stood in 1819, so that the grantees took a right to enough of the water to propel the machinery of the mill, as it then existed, or any other equivalent machinery. In 1821, Atwater conveyed to William P. Shearman what are marked on the map of Hudson as lots B. 17 and 15. These are described in the deed as "water lots," and were bounded by the river. They extended to the thread of the stream and ran to its center, vesting in the grantee the bed of the river to that extent and carrying with it, as part of the land conveyed, the flow of the water above. Prior to this deed, Atwater, as owner on the east side, could have used or permitted the use of the water on either side subject only to the Cleveland easement. After this deed he could no longer do so, for Sherman, as owner of lots on the east side, was entitled to have the river flow over them in its natural manner, and to the water power which that flow involved. His rights in lot B subsequently vested in the Wards, and those in lot 17 passed to Parsons. Lot 15, as we have said, fell before the grind of the river.

The balance of the east-side lots above the falls and below the dam, were sold by Atwater to Bissell under a description which made the river their western boundary, and so carried that line to the center of the stream. Bissell conveyed an undivided half to Hills in 1829, and by a deed of his heirs the other half went to Ely in 1832. The next year an agreement was made between Ely on the one hand, and the then proprietors of the lots on Brown's race, whom we may designate, for convenience, as the first group of west-side owners, includ-

ing, also, one Reynolds, who had become the owner of the Cleveland lot, numbered sixteen, and the easement attached. This agreement is one of those upon which the plaintiffs rely, and marks the beginning of an effort by the west-side owners to divert all or nearly all the water of the river to their own mills. That agreement begins by reciting the several proportions in which the west-side owners are entitled in severalty to the use of the water in Brown's race, aggregating, in all, sufficient for sixty-two run of stones. It then specifies the ownership of Reynolds in lot 16 on the east side, and recites that there are other owners on Brown's race who have not joined in the arrangement. It next declares that the parties of the first part have purchased of Ely his interest, and that he has conveyed the same to Erastus T. Smith, Warham Whitney and Edmund Lyon, who confess that they take the title as trustees for the whole group of purchasers. The agreement specifies the manner of payment to Ely, and shows that each purchaser in the group paid of the purchase-money precisely such proportion as corresponded with the extent of his water-power on Brown's race. The contract declares the object of the purchase to be to prevent, "as far forth as they can," the use of the water on the lands purchased and to get for themselves such use of what was described as "surplus water," and to be able to maintain the existing dam or construct a new one. After these recitals it fixes formally the terms of the agreement between the purchasers for the use and management of their purchase. Briefly stated, these are, first, that each shall be entitled to use for his own purposes his proportion of the water belonging to the new purchase through Brown's race, and that such shall be a perpetual right; second, that if it becomes necessary, in order to prevent a use of the water on the lots purchased by the other owners thereof, the new grantees will put machinery upon such lots propelled by their adjacent water-power and share the profits in the specified proportions; third, that any proprietor failing to pay his share of the purchase shall forfeit his right in the land, and that may be sold and its proceeds divided; fourth, that if the primary

purpose of the purchase shall not be realized, then again the land shall be sold and the proceeds divided. There are still other provisions, of which the ninth only needs to be recalled. That preserved to each purchaser all his existing rights of every kind totally unaffected by the agreement.

I think it is not difficult to see what was the real scope and meaning of this contract as between the several members of the purchasing group. It was an agreement among purchasers, dictating by personal covenants the manner of using the property purchased. No one owner conveyed or granted any land, or any easement in land, to his associates, or any of them. The property bought and held in common was bought for the water-power upon it, and that power was to be used on the west side, and severed in due proportion, so that each could use his own in the event that the general purpose should be realized. Since each could not use his own upon the west side, unless all agreed to that use, therefore, all did agree, and what each man got by the agreement was the covenant of the associates to use their shares on the west side so that he could use his at the same point. There was thus no grant or transfer of anything from one to another, and, as a necessary consequence, the covenants for use did not run with the land, and remained personal. An illustration of this truth is furnished by the case of *Hurd* v. *Curtis* (19 Pick. 459, 464), where the respective parties, owning independent estates, entered into covenants with each other as to the kind of wheels they should respectively use in their several mills. A grantee of one party sued for breach of the covenant and was defeated. The court held that the estates were several, and "there was no grant of any interest in the real estate of either party to which the covenant could be annexed." In the present case the water-right, bought in common, was carefully severed, considered as power; to each owner was assigned his due proportion, and each agreed to use what was his own for his own benefit, but at a particular place. No one party conveyed to any other party the slightest interest in his several and independent estate on Brown's race,

and so the covenant for use could not run with the respective west-side lots. No easement was created, for that implies a burden put upon the land of one person for the benefit of another. Here the west-side owners agreed to divert their own water, held in common, from their own land held in common to their own use elsewhere in specified proportions. The water was to be diverted in one volume, as a physical fact, through the agency of a dam thrown entirely across the river, but the rights in the water considered as power were made separate and independent. The covenants, therefore, were the personal covenants of owners in common for the use of their property held in common at a specified point, and in the exact proportion of their several ownership, and bound no grantee of any party unless they were specifically imposed upon or assumed by the grantee. I do not see how such a contract could work the result of stripping the east-side land of its natural water-right, as against grantees buying on that side to the thread of the stream, and of attaching it to the west-side lots as a part of those titles.

Beyond that consideration I think no such result was contemplated. The agreement indicates in two emergencies a purpose to sell the lots as they existed, and without change, and recognizes the impossibility at that date of effecting the desired result, and in that event distinctly provides for mills on the east side to be driven by that half of the river, and so for a use of the water in its normal and natural way. The power of the east half is denominated, with reference to its use on the west side, "surplus water," by which phrase was evidently meant water not belonging or appertaining to the west side, but a "surplus" over and above and beyond that. It is further to be observed that the right of the owners on Brown's race, as they existed at the date of the contract, by express stipulation, were not to be altered or changed, defeated or impaired by the operation of the contract itself. This seems to me a decisive indication of a purpose to obtain and control a new and separate water privilege, and not to enlarge and

extend and so alter and change an old one. In almost every point of view, therefore, it seems to be reasonably certain that the contract of 1833 was a personal covenant which worked no change in title or ownership, and fell far short of a severance from the east-side land of its natural water-right, and a transfer of that as an easement or appurtenance to the west-side lots.

But this contract does not disclose the full strength of plaintiffs' case. Two years after its execution the remaining undivided half of the Bissell purchase, which had passed from him to Hills, vested in Everard Peck, who sold his interest to Silas O. Smith and his associates. Whether these were the same identical persons who constituted the first group of Brown's race proprietors I do not know, and it may not be necessary to ascertain, but they were certainly west-side owners, and may be identified as the second group. So far as they were identical, the Bissell lots and rights had passed to them entirely, one-half from Ely and one-half from Peck, for the attempted trust failing the title went to the beneficiaries. The contract with Peck is not in evidence, but proved by recitals. The purchase from him is found as a fact. The deed given by his heirs to the defendant Whitney passed nothing but the naked legal title. The beneficial ownership went to the second group of Brown's race proprietors. Assuming the identity of the two groups, the whole Bissell right was vested in them, and the purchase from Peck advanced them one stage further towards the possibility of diverting the east-side water into Brown's race, but without changing their relations to each other or depriving the east-side lots of the water which formed a part of them as against future grantees to the center of the river, who had assumed none of the covenants of the contract of 1833.

But there still remained the hostile rights belonging to lots B, 16 and 17. In 1855 Cornelius Parsons had become the owner of lot 17, and in June of that year conveyed it and all its water rights to a third group of Brown's race proprietors. These latter were different persons from those in the first

group, but were their successors in the ownership of the property on Brown's race, and claimed to be owners of shares in the surplus waters described in the contract of 1833. That deed contains two important provisions, and especially so because the defendant Whitney was one of the grantees. It recites that he, jointly with Andrews and Rochester, owned two parts, and a fraction of the power in Brown's race, and that the aim of the purchase is, " so far as may be practicable," to increase the flow of water in Brown's race, the water-rights of which were held by the owners in severalty; and the group of purchasers covenant with each other that no one of them, his heirs or assigns, " will sell or dispose of his or their interests in the said premises, except to the successors of such party in the ownership of the water lot or water lots now owned by such party on said Brown's race without the consent" of two-thirds of the owners, the intention being that the ownership of a share in the property bought " shall be connected with and annexed, so far as practicable, to the ownership of a like share in the water of said Brown's race." By this deed the defendant Whitney is shown to have become a west-side owner. If at that date he was also an east-side owner, he could use his power on either shore, except as against his own covenant. But he made an express covenant in the deed, and in the face of that no broader one could be implied, and if it could it would be nothing more than that his share of the power belonging to lot 17 should be added, by an appropriate increase of water flow to the power of Brown's race, and be used or held by him on that race. The covenant, if implied, would relate solely to the use of his share of the power bought with lot 17, and extend to nothing else. The second thing made obvious by this deed is that the third group of Brown's race proprietors were conscious of and understood the fact that the water-right of the east side still belonged to the lots on that side as a right, if those lots running to the center of the river were so conveyed to a stranger, not a party to the existing arrangement for use. That fact was recognized as an inherent defect in the scheme of diver-

sion, for it was sought to be remedied by a mutual covenant of the purchasers, that no one of them would sell to any person not the owner or successor of an owner of the power in Brown's race, without the consent in writing of two-thirds of the owners. The aim of this covenant was to prevent the power of lot 17 from vesting anywhere except in one interested in Brown's race, who would for that reason be unlikely to use it elsewhere; but it might not bar a Brown's race owner, who was also an east-side owner from buying the shares of his associates in the power of lot 17 and then using it on the east side. He would not violate their covenants by so doing, and had made none for himself, except as to the sale of his own original share. We come now to what is known as the Ward contract. The appellants say in their brief that lots B and 16 were owned nominally by William H. and Joseph B. Ward, but in fact by the former alone. Assuming that to be true, the contract of 1866 settled the measure of power pertaining to those lots. Lot 16 was the Cleveland lot with its easement, which had passed through Reynolds, who signed the agreement of 1833, and had come down to Ward. Lot B, according to Hudson's map, stood nearly midway between the falls on the north and the entrance of the east-side race into the waters stored by the dam. It stood astride of that race and ran to the center of the river. It had upon it a saw-mill driven by water from the race. Dispute had arisen between Ward and the Brown's race owners as to his use of the water, and to settle that dispute the contract of 1866 was made. The west-side owners, as a group, constituted the party of the first part, and they, in the aggregate, as one person, contracted with Ward. They were the fourth group of Brown's race proprietors, and great changes had taken place among them. Thirteen named in the third group are absent from the fourth, and fifteen new names take their places. Among them, however, remained the defendant Whitney. The agreement recites the ownership of the parties, the ground of dispute, and that the rights of the parties of the first part among themselves, to the waters of the river, has been fixed by a

decree of the Supreme Court in 1854 at seventy-nine parts, each part representing the power necessary to drive one run of stone. It states the object of the contract to be an apportionment of the waters of the river, as between the Brown's race owners aggregated, and Ward, and contains an explicit provision that the rights and interests of the former between themselves are in no manner to be affected by the agreement. It then estimates the water-power of the river, pertaining to the several lots specified, at eighty-five parts, each sufficient for a single run of stone, and gives to Ward six eighty-fifths. Its sole effect is to limit the right of Ward, as owner of lots B and 16, to the prescribed quantity of power.

The appellants claim for it a much wider office and effect. They treat it as an admission by Whitney that the power of the whole river was represented by eighty-five parts or a force sufficient to drive eighty-five runs of stone, and that seventy-nine of these parts belonged to the then proprietors of Brown's race. Such are not its terms. It stipulates that the water and water-rights of the river " appertaining to or connected with the lots and premises herein above mentioned " shall be so represented. Those lots were the Browns' race lots on the west side and lots 17, B and 16 on the east side. It is only by assuming what we cannot admit, that the water-power of the other east side-lots had been stripped from them and attached to the west-side lots, that the division and apportionment could be made to extend to all lots on both sides of the river. On the contrary, the contract explicitly admits that no such transfer had been or was to be accomplished as to lot 17 on the east side, for while providing for a shaft to be placed by Ward over or through that lot it specifies that he shall not interfere with " the water or water-rights to which the same is entitled." This contract with Ward was after the deed from Parsons and shows that in the contemplation of all parties lot 17 had not been denuded of its water-rights, but retained them and rendered necessary a special covenant for their protection. It is observable, also, that there is nowhere in this agreement any trace of a covenant or the admission of a covenant for the

exclusive use of the seventy-nine parts on the west side, or for the diversion of any east-side water to the west side. The whole scope of the contract is to limit Ward's right to draw. And that view is enforced by the special provision that the rights of the Brown's race owners between themselves were not to be in any manner affected by the agreement. It is argued that this provision is rather formal than otherwise, but it seems to me entirely in harmony with the purpose to settle or affect no rights of the parties of the first part among themselves, but simply as against them to limit the amount of water to be drawn on the east side by Ward. For this purpose, and this only, the clause of release was drawn. The Brown's race owners released to Ward any right which they might have to reduce his supply below the stipulated six parts, and he released to them any right he might possess to draw in excess of that amount. It is said that Whitney had no water-right on the east side at the date of this agreement. I do not feel sure about that, but deem the inquiry immaterial for any present purpose. At least he had not incapacitated himself either by accepting the Parsons deed or by the contract with Ward from acquiring the east-side rights which it is found that he did possess.

Pausing at this point, let us see what had been accomplished. The dam across the river has received everybody's assent and become a fixed fact. As a consequence, all the water-power of each and every lot on both sides running to the thread of the stream was stored in the dam and distributed therefrom, each lot having its due share as part and parcel of the land itself. A division of that power was possible. The whole power of both sides pertaining to specific lots was agreed to be not less than eighty-five parts, each representing one run of stone. One-half, or forty-two and a half parts at least, belonged to each side as parcel of the water lots running to the center of the river. The Brown's race owners, in different and consecutive groups, bought all of the east-side lots and the power belonging to them, except Ward's B and 16, which were assigned six eighty-fifths. The new owners

could use the east-side power on the west side, and by personal covenants agreed to do so; but the east-side power remained a part of the east-side lots wherever it was used. It was by force of that fact that the new purchasers got it, and it was not detached or severed by any grant or conveyance. It remained a part of the land; would pass by a deed of the land; and could be used as the purchaser pleased if he had made no covenant for its use or assumed the obligation of none.

The General Term reached this conclusion. They said, "the fact that some of the owners, more or less, of the property and water privileges on Brown's race became and were the owners of land on the opposite side of the river, did not have the effect to make the right to the use of the water east of the thread of the stream appurtenant to their land on the west side, nor would such be the effect of a conveyance of the land on the east side by an owner of it on both sides excepting and reserving from the grant the right to the use of the water of the river." The learned counsel for the appellant says, as a comment, "all that I concede; but it is not this case." He then argues that the result is changed when there is superadded to the ownership on both sides the agreements for use on the west side and the force of the partition decree, to which I shall hereafter refer. My answer to that criticism has already been made, and, perhaps, may be repeated in a somewhat different form. The water-power of the east-side lots was a part of the land; such part of the land could not be severed from the other and remaining part except by deed; no such deed working a severance was made; what was done was merely a personal agreement of the owners to use a part of their property capable of physical transfer on the west side; but it continued to be an integral part of the east-side water-lots. Each west-side proprietor owned also his proportion of east-side power by force of his title to the east-side lots, and had covenanted to use his east-side power on the west side; but if he sold his east-side land to one not bound by the covenant the grantee was free to restore the use of the power to the land purchased and to which it belonged.

The question next arises whether Whitney became such grantee, and involves the transfers of land and water-rights on both sides, and the alleged estoppels asserted against Whitney by the appellants. We have seen that the Bissell purchase, which was lots C, D, 18 and A, became vested in the first group of Brown's race proprietors. Their deeds of west-side lots on that race, with the water-rights thereunto belonging, would convey none of the "surplus" or east-side water, unless by some added and specific grant of that right, or of the east-side land, of which, as matter of law, it formed a part. The present plaintiffs are the successors of the first group of west-side owners as to the west-side lots, but do not, as I understand the facts, claim to have any separate or specific grant of the east-side water, except by force of their west-side grants. In the view I have taken of the case they are not owners of the water-right belonging to lots C, D, 18 and A, and that fact alone would seem to be decisive of their claim against Whitney, for they cannot restrain the use by him of water which they do not own. On the other hand, Whitney has become the owner of almost all of the east-side lots, and of the water-power pertaining to them by force of their extension to the thread of the stream. The findings are that he has become the legal owner of the undivided half which passed from Bissell to Ely, and has acquired the interests of all the purchasers of that half from Ely, except three or four. It is also found that he had obtained the legal title of the Peck half, and was the owner in fee of forty-four sixty-eighths of the beneficial interest which passed to the second group of Brown's race proprietors. The power represented by this ownership he is at liberty to use on the east side where it belongs, unless in instances where he bought with covenants to the contrary.

It is claimed that he so purchased the eleven shares of Silas O. Smith in the Ely and Peck transfers to the first and second group of Brown's race proprietors. I suppose those shares were not included in the findings above referred to. Smith is not named among those whose rights, under the Ely purchase, Whitney acquired, and such shares may not have

been embraced in the forty-four sixty-eighths of the Peck purchase. Those eleven shares passed from Smith to Buell, and from Buell to Whitney, expressly subject to the agreement. of 1833, and with a covenant on the part of the grantees not to use the water-power appertaining on the east side. So far Whitney is bound by his covenant, but that affects only the interest bought of Smith, and not the defendants' other ownership.

It is said, however, that he is estopped by a later deed from Smith's executors. That was made in 1874, and quit-claims Smith's interest in certain property on Water and St. Paul streets derived from Buell in 1851, excepting and reserving Smith's right at his death "to the use of water originally belonging to land on the east side of the river, but transferred and made appurtenant to land on the west side of said river, *without prejudice to any rights which the said Whitney now has.*" I do not see what meaning belongs to the last clause unless it be that the grantee by accepting the deed with the exception in it as described is not thereby to be prejudiced as to any of his existing rights. The grantors chose their own terms and description of what they reserved. The grantee did not admit the grantor's title or right to the thing excepted, or the truth or accuracy of its description, but was left with his existing rights unprejudiced and unaffected. I do not think the acceptance of the deed amounts even to an admission. The other grounds of estoppel alleged relate to lot 17 and are based upon the deed of Parsons and the judgment in *Pool* v. *Connolly*, which was founded upon that deed, and the acts of the parties. If that should be conceded, it would affect only the water-right appertaining to lot 17 and not alter the necessity of affirming the judgment appealed from. It may be, as the respondent claims, that a partition was sought of the land merely without the water-right of lot 17, and that there was no jurisdiction in the court to adjudge what had become of those water-rights, by declaring that they had been diverted to the west-side lots, but it

seems unnecessary to pass on that question. Whitney bought under the decree of partition, and was himself a party to the action, and concededly acquired by that purchase only the land of lot 17, and if he has restored to it its water-power it has been by some other conveyances than the partition deed. I have thus sought to explain my own views on this complicated controversy, which are in general accord with those expressed by the trial judge and the General Term. I think it will be seen, at least it so seems to me, that there are fundamental difficulties in the way of the appellant's essential and pivotal proposition asserting the transfer of the water flowing over the east-side lots to the titles and ownership of the west-side lots. I have been unable to see how owners in severalty on one side of a stream, possessing water lots in common on the other side, could have an easement in their own lands on the other side; or how a covenant for use could run with lands not at the same time granted or conveyed. Of course, in the confusion of a great multitude of titles, it has not been easy to obtain an accurate mastery of the situation, but its main and essential facts lead me to the conclusion that the case has been correctly decided, and, as to the defendants other than Whitney, for the reasons assigned by the General Term.

The judgment should be affirmed, with costs.

All concur.

Judgment affirmed.