## SUPREME COURT.

In the Matter of the Application of FRAZER C. HALL for a peremptory *mandamus* against THE BOARD OF SUPERVISORS OF GREENE COUNTY.

*Mandamus — Construction of statute — Meaning of the words " the highest " and " the next highest," as used in chapter 215, Laws of 1870.*

The statute, chapter 215 of Laws of 1870, entitled "An act to amend an act for the publication of the session laws by two newspapers in each county of the state," declares that "the appointment shall be made in the following manner: Each member of the board of supervisors shall designate by ballot one newspaper printed in the county to publish the laws, and the paper having "*the highest*" number and the paper having "*the next highest*" number of votes, shall be the papers designated for printing the laws; provided such papers are of opposite politics

Matter of Hall.

and fairly represent the two principal political parties into which the people of the county are divided."

*Held,* that when three papers are voted for and the two claimed to have been selected received an equal uumber of votes, there has been no selection.

*Held,* further, that a *mandamus* should be granted to compel the board of supervisors of Greene county to designate two papers to publish the session laws.

*Ulster Special Term, December,* 1883.

APPLICATION for a peremptory *mandamus* to compel the board of supervisors of Greene county to designate two papers to publish the Session Laws.

*J. A. Griswold,* for motion.

*E. A. Chase* and *Mr. Werner,* opposed.

WESTBROOK, *J.* — This application presents questions of law only upon the following undisputed facts : The board of supervisors of the county of Greene, on the 24th day of December, 1883, pursuant to the provisions of chapter 215 of the Laws of 1870, entitled "An act to amend 'An act for the publication of the Session Laws by two newspapers in each county of this state,' passed May 14, 1845," undertook to designate the two papers published in the county of Greene which should publish such laws. Upon the ballot which was taken to accomplish that object, the Catskill Examiner received five votes, the Windham Journal received five votes, and the Catskill Recorder four votes. The chairman of the board, immediately after the result of the ballot had been announced, decided that the Examiner and Journal had been selected, and so also the board of supervisors, on a subsequent day, declared by resolution.

It is conceded that the Examiner and Journal are of opposite politics, the former being a republican paper and the latter a democratic one, and that they fairly represent the two

principal political parties into which the people of the county are divided.

It is also conceded that the Recorder is a democratic paper, and would likewise fairly represent the sentiments of the democratic party; and it is further averred, in the moving papers, that the Recorder was the choice of a majority of the members of the board of supervisors who had been elected upon the regular democratic tickets in the various towns.

The legal position of the applicant for the writ is, that as the two papers claimed by the board to have been selected received an *equal* number of votes, there has been no selection.

The statute (chap. 215 of Laws of 1870) declares the appointment shall be made in the following manner: "Each member of the board of supervisors shall designate by ballot one newspaper printed in the county to publish the laws, and the paper having *the highest* number, and the paper having *the next highest* number of votes, shall be the papers designated for printing the laws, provided such papers are of opposite politics, and fairly represent the two principal political parties into which the people of the county are divided."

It being conceded that the two papers which the board of supervisors claim were designated "are of opposite politics, and fairly represent the two principal political parties into which the people of the county are divided," the question which the motion presents is, when three papers are voted for, and the two claimed to have been selected received an equal number of votes, has there been a selection, as the statute in plain terms declares that "the paper having *the highest* number; and the paper having the *next highest* number of votes, shall be the papers designated?" In other words, when the law is plain and unambiguous in its language, and there is no expression, word or clause in the act limiting, construing or explaining the words used, can it receive any other construction or interpretation than that which its language plainly and directly calls for.

It was warmly contended upon the argument that in the

Matter of Hall.

enactment of this law the legislature did not *intend* what it has *said*, and that it should be read, "the *two* papers having *the highest* number of votes shall be the papers selected." It is, perhaps, a sufficient answer to this argument, to state that conceding the *intent* to enact a law in the form which is urged as the embodiment of such intent in words, yet as such words have not been employed, "that effect can not be given to an intention not expressed" (*Potter's Dwarris on Statutes,* 193). Any attempted construction of the act, however, which departs from its language, and purporting to be based upon the intention of the legislature, in the absence of any key to the meaning of the words afforded by other parts of the act, is mere speculation and must necessarily vary with the convictions of the reasoner as to what the law should have been. It is freely conceded that it would, perhaps, have been better and wiser to have so framed the law that the ballot taken in this case would have resulted in making the attempted selection a legal one; but the question is not what the law should have been, but what it is. The enactment is the result of the reasoning of many different minds, having perhaps different intents and motives, and it is therefore impossible for any court or individual to discern the intent of the framers and enactors of this statute to be otherwise or different from what has been said. No phrase or word in the act, as has already been suggested, can be found to show that what has been said was not meant. Nay, it can be supposed that the legislature intended their language to be literally followed. We know, for the act so declares, it was designed that the papers selected should fairly represent the two great political parties into which the people of the county were divided; and perhaps it was thought that by declaring "the papers designated" should be "the paper having the highest number, and the paper having the next highest number of votes," combinations between a minority of supervisors of one party, and the supervisors of the other party, by which the designation could be controlled, against the choice of a majority of the

Matter of Hall.

supervisors of the party represented by the paper to be excluded, would be rendered more difficult and less frequent. It is not unreasonable to assume that the legislature intended that the members of the board of supervisors, which formed a majority of those of one political faith, should control the selection of the paper to represent the party to which they were attached, and also supposed, because it was thus selected, it would better reflect the will of that party than one designated by a minority of such party through a combination with its political opponents. The framers and enactors of the law could not but know, when there is more than one paper of the same political party in a county, that one, by its rigid support of its party men and measures, will make itself more odious to the members of the opposite party than the other, which carries a free lance, and is more liberal in its treatment of its opponents. It frequently happens, and perhaps the present case affords an illustration, that the more liberal paper has party friends in the board, who, though a minority of its own party, can by a union with its opponents manage to have itself and the paper of opposite faith designated to print the laws; and yet the combination when made may be unable to literally comply with the statute, by making the vote of one greater than the other, and still give to the one having a vote less in number than the highest a larger vote than the paper which is to be excluded. Who can say that this all was not foreseen by the enactors of the statutes under consideration, and that the words which it contains were not purposely inserted to make any combination to produce such a result, if not impossible, at least difficult?

But why speculate as to the intent? We have plain language for our guidance, embodying a meaning which seems free from doubt, and it is safer and better to follow the statute as embodying the legislative will than to interpolate and change words so as to conform its intent to our views of what it should have been. ALLEN, J., in *McCluskey* agt. *Cromwell* (11 *N. Y.*, 593, 601), well said: "It is beyond

Matter of Hall.

question the duty of courts in construing statutes to give effect to the intent of the law-making power, and seek for that intent in every legitimate way. But in the construction, both of statutes and contracts, the intent of the framers and parties is to be sought, first of all, in the words and language employed ; and if the words are free from ambiguity and doubt, and express plainly, clearly and distinctly the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation. It is allowable to interpret what has no need of interpretation, and when the words have a definite and precise meaning, to go elsewhere in search of conjecture in order to restrict or extend the meaning." To the same effect are also the following cases : *Purdy* agt. *The People* (4 *Hill*, 397, 403); *Walker* agt. *Harris* (20 *Wend.*, 561–2), and also *Dwarris on Statutes* (*Potter's ed.*, 193). Following this plain rule as the guide, it is impossible to say " *the highest* " and " *the next* highest " mean *the two highest*, any more than it would be possible to say, if one was describing two persons out of many by their height, and in so describing them said : "A was *the highest*, and B the *next highest*," that he intended thereby to say that the two were *equal* in height of stature. If the vote cast when the alleged designation was made, which was fourteen in all, had been differently given, say eight for the Examiner, and three for the Journal, and three for the Recorder, there would clearly have been no choice, because, though you would have one paper which could be called " the highest," you would have none that could be called " *the next highest*." If, in the supposed case, the words " the next highest " must be operative in the designation, as will be conceded, why are not the words " the highest " of equal significance ? If a tie vote in the one case prevents a choice, why does it not equally prevent one in the other ? It certainly and clearly does, if words have any significance, and language is indicative of intent.

In construing this law the conclusions reached are (1st) that if the legislature has not said what it intended to say, that

then the unexpressed intent has not been enacted; and (2d) if the court has the power to nullify words and to supply others in order to give force to a supposed legislative intent, that it cannot do so when the language is clear, precise and unequivocal.

In announcing these conclusions I am well aware that other minds will take a different view of the statute under consideration. Believing, however, that the courts are to interpret and not frame laws, to my own mind the result is clear and not to be avoided. The enunciation of such conclusion brings me to the last question which this motion presents: Should the *mandamus* asked for be granted?

By the act, it is made "the duty of the board of supervisors in the several counties of this state, at their annual meeting, to appoint the printers for publishing the laws in their respective counties." That duty has not been discharged, and a duty imposed by law can be compelled to be discharged. This court has no power to inform the board what papers it should select, but it can and does inform it what is the proper construction of the statute, and how a selection must be made. It is true that the act does not require a second ballot, or a third ballot, but it does require a selection or designation, and states how it shall be made. It was unnecessary to expressly confer the right to cast a second or additional ballots, for when an act is to be done the right to do everything necessary to complete the act is conferred by implication. One ballot having failed to make a designation, as required by law, the right to take others follows.

The *mandamus* asked for should be granted, but without costs.