(64 Misc. Rep. 558.)

BURKE et al. v. STATE.

(Court of Claims of New York.   September, 1909.)

1. STATES (§ 21*)—POWERS—RIGHT TO OPERATE RAILWAY IN PARK.
   The state having acquired, pursuant to Laws 1883, p. 503, c. 336, for a state reservation, lands at Niagara Falls upon which was an inclined railway, had the power to continue its operation.
   [Ed. Note.—For other cases, see States, Cent. Dig. § 25;  Dec. Dig. § 21.*]

2. CORPORATIONS (§ 491*)—ULTRA VIRES ACTS.
   The doctrine of ultra vires is applicable to contractual relations, and is not pertinent to torts.
   [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1902;  Dec. Dig. § 491.*]

3. CORPORATIONS (§ 491*)—ULTRA VIRES ACT—LIABILITY FOR NEGLIGENCE.
   The doctrine of ultra vires cannot be invoked to defeat liability for an injury through negligence.
   [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1902;  Dec. Dig. § 491.*]

4. STATUTES (§ 185*)—CONSTRUCTION—INTENT.
   The intent of the Legislature is the canon of construction in construing a statute, and courts have implied authority to carry the same out, even when not definitely expressed.
   [Ed. Note.—For other cases, see Statutes, Cent. Dig. § 264;  Dec. Dig. § 185.*]

5. STATES (§ 184*)—CLAIMS AGAINST—JURISDICTION—COURT OF CLAIMS.
   It was the intention of the Legislature, expressed by Code Civ. Proc. § 264, as amended in 1908, that the Court of Claims should have jurisdiction where death is caused by a wrongful act, neglect, or default by the state.
   [Ed. Note.—For other cases, see States, Dec. Dig. § 184.*]

6. STATES (§ 184*)—CLAIMS AGAINST—NONRESIDENTS.
   The right to prosecute a claim against the state before the Court of Claims for wrongful death is not confined to a resident of the state, but it may be prosecuted by a nonresident.
   [Ed. Note.—For other cases, see States, Dec. Dig. § 184.*]

7. NEGLIGENCE (§ 37*)—PLACES OPEN TO PUBLIC.
   A person in possession of premises, throwing the same open to the public for the purpose of gain, impliedly warrants they are reasonably safe for the purpose designed.
   [Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 52, 53;  Dec. Dig. § 37.*]

8. STATES (§ 112*)—CARRIERS OF PASSENGERS—WHO ARE "CARRIERS."
   The state owned and operated an inclined railway at a park.  It posted notices calling attention to the railway, the fare charged to ride thereon, had ticket offices, maintained the structure, provided the cars and machinery which ran them, and received the revenue of its operation.  *Held*, that the state was a common carrier of passengers for hire, subject to liability as such.
   [Ed. Note.—For other cases, see States, Cent. Dig. § 111;  Dec. Dig. § 112.*
   For other definitions, see Words and Phrases, vol. 1, p. 978.]

9. CARRIERS (§ 316*)—CARRIAGE OF PASSENGERS—PRESUMPTIONS AND BURDEN OF PROOF.
   The rule that a carrier is bound to exercise the utmost human skill makes it incumbent on it to explain the cause of an accident to relieve

it from the presumption of negligence, and this applies to defective machinery and appliances, as in such respects the passenger must rely upon the carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1290; Dec. Dig. § 316.*]

10. NEGLIGENCE (§ 121*)—EVIDENCE—RES IPSA LOQUITUR.
The nature of an accident may itself show some prima facie evidence of negligence.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 218, 225; Dec. Dig. § 121.*]

11. CARRIERS (§ 316*)—EVIDENCE—RES IPSA LOQUITUR.
The doctrine of res ipsa loquitur is applicable where a manila rope used in the operation of an inclined railway broke, the safety appliance did not work, the device on the car did not hold it and also broke, and the car fell to the bottom of the incline.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1283–1290; Dec. Dig. § 316.*]

12. STATES (§ 112*)—CARRIAGE OF PASSENGERS—DUTY OF STATE AS CARRIER.
The state, engaging in the business of a common carrier, must maintain and operate a properly equipped road, take proper care to prevent accidents, to see that its machinery and appliances are reasonably safe, and to introduce and use such means as have been found to contribute to safety, the same as other carriers of passengers.

[Ed. Note.—For other cases, see States, Cent. Dig. § 111; Dec. Dig. § 112.*]

13. NEGLIGENCE (§ 24*)—SAFETY OF LIFE—CARE REQUIRED.
To use and keep in operation a device or apparatus for 20 years, upon which the safety of human life depends, without its being frequently or properly tested as to its continued strength and efficiency to meet the purposes for which used, is not such reasonable care as a prudent man should take to guard the safety of those intrusted to his protection.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 24; Dec. Dig. § 24.*]

Claims by Alonzo E. Burke and others against the State of New York. Judgment for claimants.

Cohn & Chormann, for claims Nos. 9,392, 9,393, 9,394.

Carlton H. White, for claim No. 9,396.

Carlton E. Ladd, for claim No. 9,399.

Daniel E. Brong, Deputy Atty. Gen., for the State.

MURRAY, J.  The above claimants seek to establish the responsibility of the state for the precipitation of the cars on the inclined railway at Niagara Falls on July 6, 1907, and to recover damages for the passengers who were in the cars at said time and suffered injury therefrom. The question of liability was tried in the above-mentioned claims, and proof of the injuries received and of the loss sustained was offered in each case.

By Laws 1883, p. 503, c. 336, the state was authorized to acquire the property afterward known as "New York State Reservation at Niagara," and about July, 1885, it was opened to the public. At the time of the acquisition of this property there was an inclined railway upon it between the upper level of Prospect Park and the edge of the water below. This railway was installed by the original owners in 1844, and,

with some changes in the form of construction and material, but not in principle, has been operated ever since. It was constructed and had been operated about 42 years before the state acquired the property. Public Lands Law (Laws 1894, p. 592, c. 317) art. 7, provides:

"There shall continue to be a board known as the commissioners of the state reservation at Niagara, consisting of five persons. * * * Such commissioners shall have the control and management of the state reservation at Niagara, lay out, manage and maintain such reservation, and make and enforce ordinances, by-laws, rules and regulations necessary to effect the purpose thereof and for the orderly transaction of business. * * * Pay into the treasury of the state, on the first day of each month, all receipts and earnings of whatever nature. ✿ * * All such property shall be managed and controlled by the commissioners, and the rents, issues and profits thereof shall be turned into the state treasury."

After the state acquired this property, it continued to operate this inclined railway for the carriage of passengers for hire—charging five cents for transportation up or down the same. Signs were posted: "Inclined railway, fare five cents each way." Ticket offices were established at each end. Tickets were sold by employés of the state, and the amount of the fare charged was collected by them. These receipts were turned over to the superintendent of the reservation as treasurer, and were deposited by him each day in a bank. At the end of each month they were remitted to the Comptroller of the State. A great number of persons were carried on this road each year. The "incline receipts" for the year ending September 30, 1906, were $12,971.40; and the average receipts from this railway were about $10,000 each year.

This inclined railway, as operated by the state on July 6, 1907, at the time of the accident hereafter described, consisted of two parallel tracks on which two cars were run, one car on each track. A large manila rope cable, three-quarters of an inch in diameter, passed from one car up the incline into the power house at the top, around a large wheel, called a "bullwheel," and then down to the other car. The machine turning the bullwheel runs one car up while the other car is going down. In addition to the manila cable, which was the power cable, there was attached to each car a steel safety cable, seven-eighths of an inch in diameter. This steel cable passed from one car—the same as the manila rope—up the incline and round the safety carriage in the floor of the upper or power house. The motor power at the time of the accident was electricity. In former years it had been water. Turning the motor in either direction would take one car up and the other car down. Reversing the motor would reverse the direction of the cars. In the operator's room was a large handbrake which operated on the bullwheel around which the manila cable passed. There was a handbrake on the safety carriage which worked automatically, also one which worked by hand. There was only one cable or rope which went from car to car over the bullwheel. The rope which was ordered in 1906 was 330 feet long, from which 8 or 10 feet had been cut off. The total length of the track was about 324 feet. The cars were 18 feet in length, and weighed about 2,200 pounds without passengers. The manila rope, which was attached to the cars, ran between the tracks, over a series of pulleys called idlers. These idlers

were to keep the rope from wearing on the timbers of the track. At the top of the track there was an iron sheave, or wheel, about 2½ to 3 feet in diameter. When the rope reached this iron sheave, it partially bent to change from a 31 degree incline to a horizontal. It then came in contact with a wooden sheave, then to another sheave of wood, and then passed partially around the circumference or groove of the bullwheel. The bullwheel was six feet from face to face, and was iron. From the bullwheel to the nearest sheave was 6 feet 6½ inches. From the sheave to the next was 5 feet and ½ inch. The iron sheave was about 10 feet from the next. The diameter of the sheave was about 20 inches. All the sheaves were of wood except the iron one.

Under each car there was a metal drum about 14 or 15 inches in diameter. It turned upon an axle, and there were about 12 grooves around the surface of it. It was permanently attached to the car by means of a cast iron shell or bracket which was for the purpose of sustaining the worm and holding it in a fixed position on the car. The safety cable was wrapped around this drum three to five times, and fastened to it. The end of the steel cable passed through the drum, then through a wrought iron collar, and the screw set into the cable to make it fast. This drum was turned either way by use of a worm. On the end there was a wheel similar to a brake wheel on a freight car. When the worm was turned, it caused the drum to turn at right angles to the turn of the worm, and the steel cable to be tightened or loosened. The drum was cast iron and hollow. It was broken at the time of the accident; and, if the cable parted, most of the strain would come on the shell supporting the worm. There was no brakeman on the cars.

The metal cable, which was wound three or four times around the drum, ran out underneath the car, up the incline, over two sets of idlers on the track to prevent its wearing, and under the floor of the operating room at the top of the incline. When it reached this room, it went over idlers or sheaves to change it from a 31-degree incline to a horizontal. It then touched a sheave, which was on a device which ran on a truck called a tension carriage. The wire cable then went around this sheave attached to the tension carriage, and then over other sheaves to change its direction and down the track to the other car. The tension carriage ran on wheels on two horizontal tracks. Its purpose was to keep the metal cable from slacking, and on it was a wheel or sheave with a groove in the center over which the steel cable passed. This tension carriage was held back a certain distance by a system of buffers or bumpers which were fastened to the back of the carriage and went over a couple of sheaves and then up and through a partition and a drum again, with weights attached to the lower end of the rope to keep the tension taut. In front of the carriage was a sliding brake shoe which was to act against the face of the sheave.

In front of the carriage was a spring bumper. It would go forward sufficiently to set a little grip on the safety cable. In case the tension carriage went forward far enough to bring the two bumpers together, it would set the brake on the wheel or sheave; and it also "actuated"

two little brakes that acted on the wire rope brake. So, if the manila' rope broke, the tension carriage would run forward a sufficient distance to bring the two brake bumpers together. The bumpers were ordinarily about 18 inches apart. The tension carriage would travel about 18 inches before it 'would set the brakes on the wire cable. There would be that distance of about 18 inches which the cars would travel down the tracks, if the manila rope broke, before the strain would come on the metal cable.

The drum, worm, shell, or bracket, the metal cable, the bumpers, the tension car and the mechanism with it, had nothing to do with the operation of the cars. They were supposedly for the purpose of holding the car if the manila rope broke.

Back of the house where the man operated the machine was a little tell or gauge, which indicated the distance between the bumpers. On the back of the car there was fastened a steel cable which went to a pulley, then through a partition over two pulleys, and then down with weights attached to keep the car back or taut. Back there was a little indicator, or printer, which ran up and down in a groove in the wooden partition; and alongside the groove it was spaced off into inches and feet to indicate just how far apart were the two bumpers. If the manila cable broke, both cars would go down the incline until the bumpers came together. The brake on the large sheave and the two little spring brakes on the wire cable should stop the cars gradually. There would be a brake at about 18 inches, a gradual descent of about 5 to 7 inches more, then the car should come to a rest if the cable or anchoring held it. This device and appliances described were put in about 1887 and have been in use ever since. The worm, shell, and drum were never changed and were used for 20 years. The only record of the safety plant being tested was when it was put in.

The twenty-fourth annual report of the commissioners of the state reservation at Niagara contains the following:

"The accident at the inclined railway on July 6, 1907, referred to in the superintendent's report, was a lamentable verification of the warnings which this commission had given to the Legislature and its pleadings for an adequate appropriation to replace the antiquated means of communication between the upper level of Prospect Park and the edge of the river below. In our report to the Legislature of 1906, we frankly stated that the danger line of economy had been reached, and expressed the hope that means might be supplied to keep unbroken the previous record of safety to human life."

No evidence was given of any appropriation, or that the structure was repaired or improved, or that the defects or deficiencies complained of were remedied, or that means were supplied to keep unbroken the previous record of safety to human life. The chief bridge designer and builder of the state engineer's office about May 9, 1907, made a general inspection of the situation with others. His examination was principally confined to the structure and not to the safety plant and cables. In substance he said:

"About May 9, 1907, we made an examination of the situation at the state reservation at Niagara Falls. It was a general examination to ascertain whether in our judgment the railway could be safely operated that season, more particularly to ascertain defects in the roof covering which protected the sides and the roof forming an inclosure over the railway; but it applied

fᴏ the railway as a whole. A rather detailed inspection was made, principally of the different timbers which supported the track, of the different timbers which supported the sides and roof of the inclosure, and a general inspection of the cars—their wheels and cables and idlers and machinery—to see if they were in proper order and condition for use during the season about to open."

There was more anxiety about the road and the inclosure because it was known that some of the timbers were not of sufficient strength to carry the loads of ice formed on them during the winter. For that reason the structure had been temporarily condemned during the winter, and it was particularly desired to know if the structure had been injured and whether it was safe to continue its use during the summer. The railway appliances were not examined with as much detail as they might have been examined. In a general way he walked up and down the track. Cars, cables, and safety appliances were examined in a general way.

The order for the manila rope in question was given May 30, 1906, to a reputable firm. It was to be 340 feet long, 3¼ inches, 4 strand piece manila rope, "the very best and strongest rope that can be made." This firm manufactured the rope of the very best hemp. No definite test was made of the rope before it left the factory, but the manufacturers had a way of testing with their hands. One familiar with the fiber knows the strength. The textile strength of this rope was 70,000 pounds. This manila rope was put on the cars June 18, 1906, and was used until the accident, July 6, 1907. The cars were not operated and the rope was not used from December 24, 1906, until the following May 19th. The ordinary life of a manila rope similar to this is about two years, and manila rope had been used as a cable on these cars for nine years. There were 193 yarns in each strand of the 1906 rope, 241 yarns in each strand of the 1905 rope, and 276 yarns in each strand of the 1904 rope. The 1906 rope, which broke, was kept on the cars all the winter during the time it was not used. It was under cover, but exposed and subject to such atmospheric conditions as prevailed. For some time prior to the accident parts of this manila rope had become worn and frayed. They were wrapped with pieces of burlap and the rope was continued in use. The accident occurred about 11 o'clock in the forenoon of July 6, 1907, which was a fair dry day.

A state employé, who was the operator running the inclined railway at the time of the accident, says that he had charge of the incline to see it was in good running order and that he attended to it every day; that the cars were started by a controller, started by a handle bar on the controller; the controller has a handle on it and a little pointer with notches around it; the handle is shoved from point to point to start the car; that he started to send the south car down and bring the north car up; he started them in the usual way with his hand on the controller handle, and stood watching the car go down. It had gone about one-third of the way down, when he heard an explosive like noise. He knew what had happened, and immediately shut off the power. By that time he saw the safety cable had broken, also he felt the cable come out underneath the floor where he stood. He felt the

jar also of the tension carriage, and saw the rope cable had broken about one-third of the way back of the down-bound car. After the breaking, the safety device had sprung back to its original position. The bumpers had been covered with rust, but they were bright which showed that they had come together. When the manila rope broke, the south car was not running very fast. It took about a minute and a half to run down, and the car had gone about one-third of the way. There were about three notches of the controller on, which was about the full speed of operation going down. The manila rope broke about 85 feet from the south car. When it broke, part of it was attached to the south car going down with it, and part of the other part was attached to the north car going down with that. The steel cable was still attached to the north car. It was pulled away from the drum of the south car, and was lying in a heap on the railway track. When the cars fell, they wrecked the ticket office at the foot of the incline. They went through a double floor, the lower part of which was laid with two-inch planking and the upper part of which was one inch thick. After the accident the worm was found some distance up the track— about two-thirds of the way from the bottom. The drum was broken, and was at the bottom of the incline beneath the car, beneath the floor of the wrecked building.

The claimants' experts made an inspection of the situation on July 7, 1907, and their conclusions and opinions are practically the same; so that a synopsis of the evidence of one need only be given. The manila rope was examined at this time and measured under the car, where it had the appearance of being unworn; and there it measured 11 inches in circumference. It was also measured where it showed the most wear, which was near the vicinity of the brake, and there it measured 8⅞ inches in circumference. A number of yarns were taken from the rope near the brake and tested. They showed an average textile strength of about 80 pounds for each yarn. Specimens were taken from the unworn part and tested, and they showed an average textile strength of 200 pounds per yarn. It was estimated the textile strength of the rope had depreciated 60 per centum. The drum of the worm attachment on the south car was examined. The worm was found two-thirds of the way up the incline from the bottom, showing it had fallen off there. The remainder of the apparatus was still attached to the bottom of the car. The worm had broken and fallen, releasing the drum, allowing the rope to unwind and pull it from the collar. The drum was held to the car by a cast iron shell which averaged from nine-sixteenths to thirteen-sixteenths of an inch in thickness. After the accident, the state also had tests to demonstrate the strength of this rope. Seven sections were cut from the rope cable, and were shipped to the United States Arsenal at Watertown, Mass. There they were spliced and subjected to various tests. To epitomize, these tests showed a textile strength of from 38,400 to 80,000 pounds. Other tests were made of the yarns, showing an average strength of about 119 pounds to each yarn, making the textile strength of the cable about 18,900 pounds, and showing that it was sufficient for the purpose for which it was used.

Claimants sought to show that it was not proper to use the cast iron shell mentioned; that it was obsolete, had deteriorated, was weakened, and was not safe; that cast iron had gone out of use, was poor material for this purpose, and that malleable iron or steel was better. The state showed by an employé of the Otis Elevator Company, the successor of the Howard Iron Works who originally made the appliance, that the cast iron shell safety device on the car was made 20 years ago; that such were used at that time and are used at the present day; and that all the large elevators are made that way of cast iron. Claimants sought to prove that the tension carriage was not of suitable design, but admitted that the safety device with 18 inches between the bumpers was a proper design. The experts of the claimants contended that it was improper to use a rope cable; that manila rope was not proper to use in any form for this purpose; that manila cable is rarely used now; that it is the present custom to use iron or steel cable—it is safer. There were a lesser number of yarns in the strands of the 1906 rope that broke than were in the strands of the cables of the preceding years. See supra. It was the opinion of the state's witnesses that this would make no difference in the tension strength of the rope; that a manila cable which had a smaller number of yarns was better than one which had a larger number, considering the size of the driving wheel and its running over such large sheaves. The opinion of the claimants' expert was to the contrary—that a manila cable with the greater number of yarns would wear better. Each side sought to give some reasonable hypothesis—some plausible explanation of the accident.

The twenty-fourth annual report of the commissioners of the state reservation at Niagara for the year ending September 30, 1907, contains a copy of the letter from the chairman of the executive committee of the commission to the Governor of the state, dated July 9, 1907, in which it is stated in reference to this accident:

"So far, and after a careful examination, no specific reason can be given for the breaking of the cable and the accident happening."

A witness for the state expressed the opinion that the rope could be broken by a sudden application of power, or a slip of the wheel, or a reversion of the power; anything that would give the rope a sudden jerk. The superintendent of the firm which manufactured the rope says: That the only reason he could give was that the rope met with an accident; either that the rope had been willfully cut, or had been cut with some sharp instrument, or that it had met with a strain. Something got fast so as to pull the rope to the extent of its breaking capacity, which was about 50,000 pounds in that condition. That he had never seen such a short break unless it had been found afterward to have been cut with a sharp instrument. A rope will break in one strand, will break in one place, and the next break will be four or five feet from it. So, when you take the two ends of the break, you will find the yarns stretching from the perfect rope; and, where it pulled out, it will sometimes be fifteen or twenty feet. The break here is just as clean as though it had been cut with a knife. I have never seen a break that was so close, but something caught either the car or a por-

tion of the rope on either side of the break. The claimants' experts, in addition to the defects and deficiencies before mentioned, testified that, the rope being wrapped with burlap, the burlap weakened the rope and caused it to kink and break; and, when the manila rope broke, the strain came on the safety device. The strain came suddenly, and it was more than the iron could stand. At the time of the accident the upper car was on the south track going down. The lower car was on the north track coming up. In the south car going down were a man and a woman. In the car coming up were a man, his wife, and child. The man in the south car was killed. The other persons, excepting the child, were more or less seriously injured. All these persons were lawfully in the cars, having paid the fare exacted, and were being transported for hire.

Such is the history and such are the salient points of the evidence, with the conflicting opinions and theories, in this important case.

The state offered no evidence that it did not acquire the property; that it did not open the reservation to the public as stated; that it did not operate the road at the time of the accident and receive the profits therefrom; that it did not ask and receive the fare charged; that the passengers were not in the cars and were not being transported for hire; that the cars on the 6th day of July, 1907, did not fall to the bottom of the incline or that the persons in the cars were not more or less injured.

The Attorney General urges: First. That it was beyond the governmental powers of the state to operate the inclined railway—that the state could not lawfully engage in an enterprise of that character. Second. The doctrine of ultra vires. Third. That this court has no jurisdiction to hear and determine the claims. Fourth. That the Burke claimants, being residents of the state of Kentucky, have no standing in this forum.

We will consider these preliminary points in the order given.

First. That the state could not lawfully run the inclined railway; that it was an unconstitutional assumption of power.

The State Constitution (article 3) provides that the legislative power of the state shall be vested in the Senate and Assembly. The legislative power is absolute and unlimited, except as restrained by the Constitution. Bank of Chenango v. Brown, 26 N. Y. 467; People v. Flagg, 46 N. Y. 401. The Legislature possesses the whole legislative power of the state, except as it is limited by the express provisions of the federal Constitution or of the State Constitution. People ex rel. McDonald v. Keeler, 99 N. Y. 463, 2 N. E. 615, 52 Am. Rep. 49. The Legislature, even without any constitutional provision as to the extent of its authority, has all the power which the people have, unless such power is restrained by some constitutional provision. People v. Young, 18 App. Div. 162, 45 N. Y. Supp. 772. The legislative will is sovereign. A statute cannot be declared void unless it conflicts with some express provision of the Constitution, or infringes on some natural right. People v. Lawrence, 54 Barb. 589; Ahern v. Elder, 195 N. Y. 493, 88 N. E. 1059. Chief Justice Ruger, in Sipple v. State,

99 N. Y. 284, 288, 1 N. E. 892, 894, in writing the opinion of the court, makes the following remark:

"Reason and justice require when it engages in public enterprises from which a revenue is expected to be derived * * * that it should compensate," etc.

See, also, opinion of Senator Hand in Mayor v. Bailey, 2 Denio, 433, 450.

The state of New York possesses all the original attributes of sovereignty; and, unless these attributes have been restricted by the State Constitution, or limited by cession to the federal government (Fed. Const. art. 1, § 10), they are unlimited and unrestricted. The Legislature, acting for the people, can exercise this power, unless they infringe upon some natural right in any way or for any purpose it deems wise or proper. The legislative will, unless restricted as above, is supreme.

The state, by this supreme will of the Legislature, acquired this property, known as the "State Reservation at Niagara," with its appurtenances. By this same authority it clothed the commissioners with power to transact business and pay into the treasury of the state all the receipts and earnings therefrom. All the property was to be managed by the commission, and the rents, issues, and profits were to be turned into the state treasury. The authority to do an act carries with it the means to accomplish it. The power to transact business carries with it the means of conducting the business; and the command to pay over receipts and earnings implies the right to use the way or devise the means to produce receipts and earnings. Where an act is authorized by statute, the right to do everything necessary to complete the act is conferred by implication. Hall v. Supervisors, 13 Abb. N. C. 421. The inclined railway was in operation at the time the state acquired the property. The state, as above, authorized and empowered the commissioners to continue running it; and they made their annual reports to the Legislature of their proceedings, of the transactions of their business, and the receipts and earnings therefrom. The state received the receipts of the inclined railway—the issues and profits—monthly, for years. These were all paid into the state treasury, and were received by the state, during all this period, without objection. The state cannot act itself. It must act through its officers, like a corporation, which acts through its agents and sees through their eyes. Reise, Ultra Vires, § 223. A long-continued course of action by public officers, under a statute, has weight in construing it. Matter of Board of Street Opening, 12 Misc. Rep. 526, 33 N. Y. Supp. 594; Matter of Washington St. & P. R. R. Co., 115 N. Y. 422, 22 N. E. 356. There is no restriction in the Constitution inhibiting these acts of the Legislature, and there is every presumption in favor of their legality. No authority has been cited, nor has any diligence in research discovered any precedent, against them. It was one of those public enterprises, mentioned by Chief Justice Ruger, from which a revenue was expected to be derived.

Second. As to ultra vires.

Municipalities and corporations may be limited in the exercise of power by the prepotent authority which gave them life. They are statutory creatures. By what power, by what authority they act is known; and, if they transcend them and do an act beyond, the prescription may be pleaded. The state is not such. It makes; it is not made. The doctrine of ultra vires is applicable to contractual transactions. If a person deals with a party in a special capacity, or acting by virtue of special authority, the person may prudently ascertain that the party in the special capacity, or with the special authority, has the power to do, and the authority to act. It should not be applied to the public. It is an ungracious defense and ought not to be extended. Suppose a corporation, and the state has been likened to a corporation (State of Indiana v. Woram, 6 Hill, 33, 40 Am. Rep. 378; 1 S. & R. Neg. [5th Ed.] § 249), should negligently erect an unsafe structure, charge an admission and invite persons—the public—generally to enter, that the structure, by reason of age, weakness, or defects, should collapse and catastrophies follow; could ultra vires be successfully pleaded? I think not. The structure was erected. The public was invited to enter. They did so, paying the admission, with the legal presumption that it was reasonably safe for the purposes for which they were asked to enter. The public should not be expected to ascertain the corporation's power, or be charged with knowledge of its want of authority. Nor should the corporation be allowed to plead ultra vires successfully as a defense. See Van Cleef v. Chicago, 240 Ill. 318, 88 N. E. 815. To sanction such a defense would be abhorrent to the principles of equity, justice and fair dealing. It would be against public policy and fall within the ancient maxim that "law is good sense and what is contrary to good sense is not good law." A corporation cannot defeat liability for an injury caused by the negligence of an officer on a steamboat, with the plea that the running of the steamboat was ultra vires. Reise, Ultra Vires, § 163; Cent. R. Co. v. Smith, 76 Ala. 572, 52 Am. Rep. 353.

In Cent. R. Co. v. Smith, 76 Ala. 572, 52 Am. Rep. 353, the corporation in the case was chartered as a railroad and banking company. It ran a steamboat on the Chattahoochee river and invited the public to ride on the boat. A passenger was injured through the negligence of one of the officers of the boat. It was held:

"A corporation chartered only as a railroad and banking company, although it has no authority to run a steamboat, is still liable to a passenger injured on a steamboat operated by it."

And see note by editor at page 358, of 52 Am. Rep.

The court says "corporations may commit almost any kind of tort and be liable to an action for the same. In such case the doctrine of ultra vires has no application," and generally corporations are liable for the consequences of tortious acts done by its authority, though not within the scope of its powers, express, implied, or incidental. In Bissell v. Mich. So. & N. I. R. Co., 22 N. Y. 258, a leading case, the court held that corporations, like natural persons, have the power and capacity to do wrong; that corporations have no right to violate their

charters, but they have the capacity to do so, and are to be bound by their acts where a repudiation of such acts would result in manifest wrong to innocent parties; that the plea of ultra vires, according to its just meaning, imports not that the corporation could not make the unauthorized contract, but that it ought not to have made it; that such a defense is not to be entertained where its allowance will do greater wrong to innocent third parties; that, although corporations cannot rightfully do any act not authorized by their charters, yet such acts, when done, are to be regarded as the corporation's acts; and, if in the course of their performance others are injured by the negligence of the officers of the corporation, the corporation is responsible, such liability arising from the duty which every railway company owes to persons within its cars with its consent. New York, New Haven & H. R. Co. v. Schuyler, 34 N. Y. 30. In Vought v. Eastern Buildg. & L. Ass'n, 172 N. Y. 508, 518, 65 N. E. 496, 498, 92 Am. St. Rep. 761, it was held that a corporation cannot avail itself of the defense of ultra vires, where the contract has been in good faith performed by the other party, and the corporation has had the benefit of the performance of the contract.

The court in its opinion says:

"While they (corporations) have no right to violate their charters, yet they have the capacity to do so, and are bound by their acts where a repudiation of them would result in manifest wrong to innocent parties, and especially when the offender alleges his own wrong to avoid a just responsibility."

Hannon v. Siegel-Cooper Co., 167 N. Y. 244, 246, 60 N. E. 597, was a case where the defendant maintained a department store. It advertised a department of dentistry and invited the public to patronize it. The plaintiff went there, and was negligently operated on by one of the defendant's employés. Held, that the plea of ultra vires was not applicable to the public. The court says:

"It would seem that the action of the defendant in assuming to carry on the business of dentistry was illegal and ultra vires. But, though it was beyond the corporate powers of the defendant to engage in the business, this does not relieve it from the torts of its servants committed therein."

The text-book writers state the general rule to be that corporations are liable for every wrong of which they are guilty, and in such cases the doctrine of ultra vires has no application. Ultra vires is not pertinent to cases of torts. In a broad sense all torts of corporations are ultra vires. But, where injury is due to the improper use of power granted, it is not ultra vires. There is not an assumption of power, but an abuse of power granted. Reise, Ultra Vires, § 162; Randolph, Em. Dom. § 119, and other writers; Suth. Dam. § 5.

It is no defense to an action for personal injuries that the same were incurred while the parties were carrying out an illegal contract. Greenhood, Public Policy, rule 56, p. 41. Brice on Ultra Vires also says: Corporations may commit ultra vires torts and be liable, and it makes no difference whether a corporation is a mercantile one making profits out of its undertaking, or that it exists merely for public purposes. 416, 417. "If a corporation in what appears to be the due prosecution of its enterprise or due exercise of its powers, engages

in or directs proceedings which necessarily cause an ultra vires tort, it is liable therefor. 437. If a corporation engages in proceedings apparently in the due prosecution of its enterprise or due exercise of its powers, and a duty, common law or statutory, is imposed on it by reason of such proceedings, then, although it should turn out that such proceedings are ultra vires, the corporation will be liable in tort for any breach of such duty. 438. If a corporation or its managing body, bona fide believing that a particular transaction is within its powers, direct an act which turns out to be ultra vires, still the corporation is liable to any person damnified. 439. It must be clearly remembered that where positive duty is thrown upon public bodies which they omit to observe, or where they are guilty, personally, or by agents, of torts, intentional or negligent, they may be answerable sometimes in damages to parties injured, and sometimes in statutory penalties; and it is no answer that their services are purely honorary. 481. Brice, Ultra Vires, 416, 417 et seq., 421, 437, 438, 439, 481.

Third. As to the jurisdiction of this court.

Section 264 of the Code of Civil Procedure, as amended in 1908, provides:

"The Court of Claims * * * has jurisdiction to hear and determine a private claim against the State, including a claim of an executor or administrator of a decedent who left him or her surviving a husband, wife, or next of kin, for damages for a wrongful act, neglect or default on the part of the state, by which the decedent's death was caused. * * * And the state hereby consents in all such claims to have its liability determined * * * upon such legal evidence as would establish such liability against an individual or corporation in a court of law or equity."

The intent of the Legislature is the canon of construction in construing a statute, and courts have implied authority to carry out the intention of the Legislature, even when not definitely expressed in the statute. By this section the state waives its sovereignty and consents to have its liability determined in this court. It was evidently the intention of the Legislature, and I think aptly expressed, that this court should have jurisdiction in those cases when, by a wrongful act, neglect, or default on the part of the state, the death was caused. The intent of the Legislature is the object of all construction. Matter of People ex rel. Niagara L. & O. Power Co., 111 App. Div. 686, 97 N. Y. Supp. 853; Gress v. Hilliard, 85 App. Div. 507, 83 N. Y. Supp. 204. Where a case is brought within the intent of the maker of a statute, it is within the statute, even though not definitely expressed. Topham v. Interurban St. R. Co., 96 App. Div. 323, 89 N. Y. Supp. 298; Hurst v. City of New York, 55 App. Div. 68, 67 N. Y. Supp. 84. The principle which is to control the interpretation of a statute is the intent of the Legislature, which may be ascertained from the cause or the necessity of the enactment, as well as from other circumstances. People ex rel. Heiser v. Gilon, 76 Hun, 346, 27 N. Y. Supp. 704; People ex rel. Wood v. Lacombe, 99 N. Y. 43, 1 N. E. 599. The rule is that the court in the construction of a statute has implied authority to carry out the clear intent of the Legislature. Atlas Refining Co. v. Smith, 52 App. Div. 109, 64 N. Y. Supp. 1044.

The state, in submitting itself to the jurisdiction of a tribunal with

respect to claims against it for damages sustained by reason of any accident, subjects the determination of its liability to those rules which usually obtain in determining the liability in similar cases between individuals and corporations. Gates v. State, 128 N. Y. 221, 28 N. E. 373.

Fourth. That the claimants Burke, being nonresidents of this state, have no standing before this tribunal.

If wrong there was—if act of negligence was committed—the wrong was done and the act of negligence was committed within the boundaries of this state and within the territorial jurisdiction of this court. If an act of negligence was committed by a corporation or an individual within this state, whereby a nonresident was injured, the nonresident would have the right to come to other courts of the state for the redress of the alleged wrong. When the courts have jurisdiction of the subject-matter of a controversy arising in this state, or of the defendant, a nonresident may appeal to the state courts for a determination of the controversy. The Empire State ought not to deny to the stranger, within her gates by invitation and complaining of wrong, the same privilege which she grants to her citizens to have the wrong investigated, and its liability therefor determined, in its own court, upon such legal evidence as would establish such liability against an individual or corporation. Therefore, when a statute confers general jurisdiction upon this court to hear and determine the state's liability respecting specified causes of action, the state waiving its sovereignty in respect thereto, and there is no restriction in such statute and no expression from which it can be implied that the Legislature intended to confine such privilege exclusively to residents of the state of New York, this court has jurisdiction to hear and determine the claims of nonresidents, as well as residents of the state of New York, which come within the purview or intendment of the statute.

In Alfson v. Bush Co., 182 N. Y. 393, 75 N. E. 230, 108 Am. St. Rep. 815, Judge Bartlett, writing the opinion of the court, says:

"This rule of the common law, judged by the standards of to-day, rested on a foundation that was neither just nor enlightened. It had its origin in an age when the many phases of our modern civilization, which must have impelled the legislature to act, did not exist. During the nineteenth century the world witnessed many and important changes; national isolation passed away; international communication became universal; all civilized mankind were brought together in commercial, social and intellectual intercourse; foreign travel became general; the result of these conditions was that the old prejudice against the foreigner practically disappeared. * * * It is difficult to conceive of any argument springing from public policy, sound reason, or a proper discrimination between the rights of the citizen and the alien that should prevent the alien husband, wife, or next of kin of a laborer killed by reason of his employer's negligence from receiving those damages that a jury has awarded. * * * There is no valid reason why they should not be paid to the survivors whether residing here or in some foreign jurisdiction. * * * The conflict of authority in England and our sister states leads us to deal with this question on principle, and to base our answer to it on reasons that are weighty and controlling."

No representative of Burke's is suing in the case at bar, but he and his wife are individually presenting their claims for personal injury,

received while within the state. But, if the reasoning of Judge Bartlett be applicable to aliens, surely it ought to be more pertinent to a citizen of the United States and a resident of a sister state. Our states are all parts of a common republic, and their inhabitants travel from one end of our dominion to the other without thought of state boundaries. They are brought into social, business, commercial, and political relations with each other, and act together for the national weal. They are an integral part of a common whole; and, if a state has waived its prerogative of sovereignty, when they come within its limits, whether on business or pleasure, by invitation or volition, they should be entitled to the privileges given and granted by the state. Burke was not a citizen of a different principality. He was not an alien nor a foreigner. He was a citizen of these United States, and, though living in another part of our union, was a citizen of the general government residing in the state of Kentucky.

Freund on Constitutional Rights and Public Policy, §§ 708, 709, cites the provision of the federal Constitution (article 4, § 2), "The citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states," the section of the United States Revised Statutes, and cases that "nonresident creditors cannot be postponed to resident creditors," and that the same is true of the right to institute actions. Cole v. Cunningham, 133 U. S. 107, 10 Sup. Ct. 269, 33 L. Ed. 538. The object of this clause is not to give nonresidents higher, but equal, privilege with residents. See N. Y. Leg. Man. 1909, p. 59, and cases cited.

Having disposed of these preliminary objections raised by the state, I will now give my views of such facts as were admitted or proven; and my conclusions derived from a consideration of the questions in dispute. When the state opened the reservation at Niagara and placed placards announcing the inclined railway and the amount charged to ride thereon, it invited the public to enter and ride in the cars; and the persons entering and riding in the cars had the right to assume they were reasonably safe, suitably equipped, and that proper and reasonable care had been taken to safeguard them against accident or injury. "Where a party in possession of premises throws the same open to the public for the purpose of gain, he impliedly warrants the premises to be reasonably safe for the purpose for which they were designed, * * * and, where * * * the plaintiff is injured by the fall of a structure she is using at the invitation of the person in charge, and in the manner which such person had a right to expect the same would be used, the burden of explaining the accident and showing freedom from contributory negligence is upon the defendant." Schnizer v. Phillips, 108 App. Div. 17, 95 N. Y. Supp. 478; Clarke v. Welsh, 93 App. Div. 393, 87 N. Y. Supp. 697. "A proprietor of a store extends an implied invitation to customers to enter his premises, thus authorizing them to believe he will take reasonable and prudent care of them." Swinarton v. Le Boutillier, 7 Misc. Rep. 639, 28 N. Y. Supp. 53; Larkin v. O'Neill, 48 Hun, 591, 1 N. Y. Supp. 232; Beach, Contrib. Neg. 282, § 190. "The state acting through its duly constituted officers is equally bound by their acts, as an individual would be bound under the circumstances." People v. Stephens, 51 ·

How. Prac. 235; Id., 71 N. Y. 527. The state owned and operated the inclined railway at the time of the accident. It placed placards announcing the railway, notices calling attention to it and the amount charged to ride thereon, thereby inviting the public to patronize it and to pay for the transportation. The state had ticket offices for the sale of tickets to ride on the railway, with its employés to sell the tickets, to receive the sum charged and to collect the tickets sold. The state maintained the structure, provided the cars and appurtenances and the machinery which ran the cars. Its employés operated it, and its officers had the care, control, and management of it. It received the fruits from operating it. The receipts from it were turned into the state treasury. Any person who bought and received a ticket was entitled to ride thereon as a passenger. This made and constituted the state a common carrier of passengers for hire, and subjected it to the duties and liabilities attaching to such carriers. "A common carrier is one who transports such passengers as choose to employ him from place to place for reward." Whart. Neg. §§ 545, 625, and other textwriters. "The duty of a common carrier * * * requires something more than ordinary or reasonable care for the safety of passengers. It calls for watchfulness and a high degree of care and skill to guard them against injury * * * and to use every reasonable precaution which human skill, · care, and foresight· can provide." Lansing v. Coney Island & B. R. R., 16 App. Div. 146, 45 N. Y. Supp. 120; Schlotterer v. Brooklyn & N. Y. Ferry Co., 75 App. Div. 333, 78 N. Y. Supp. 202; Brown v. New York Cent. R. R., 34 N. Y. 404.

The rule that a state railway company is bound to exercise the utmost human skill and foresight in reference to maintaining and operating and keeping in repair its tracks and appliances, in order to save a passenger from harm, makes it incumbent upon the company to explain the cause of the accident in order to relieve it from the presumption of negligence; and this applies to defective machinery and appliances, as in these respects the passenger must rely upon the carrier, and therefore the burden of explaining the accident is on him. Klinger v. United Traction Co., 92 App. Div. 100, 87 N. Y. Supp. 864; Suse v. Metropolitan St. R. Co., 80 App. Div. 24, 80 N. Y. Supp. 513; Stierle v. Union R. Co., 156 N. Y. 70; Jensen v. Hamburg-Am. P. Co., 23 App. Div. 163, 48 N. Y. Supp. 630; Wynn v. Cent. Park R. R. Co. (Com. Pl.) 14 N. Y. Supp. 172; Chase v. Jamestown R. R. Co., 60 Hun, 582, 15 N. Y. Supp. 35. Injury caused by the breaking of an axle is prima facie evidence of negligence. Hegeman v. Western R. Co., 16 Barb. 353; Id., 13 N. Y. 9, 64 Am. Dec. 517. The nature of the accident may itself show some prima facie evidence of negligence. Russell Mfg. Co. v. New Haven Steamboat Co., 50 N. Y. 121; Caldwell v. New Jersey Steamboat Co., 47 N. Y. 282; Brehm v. Great West. R. Co., 34 Barb. 256; Walker v. Erie R. Co., 63 Barb. 260; Jones v. Cent. R. Co., 62 How. Prac. 450.

The facts and the attendant circumstances relating to the accident in this case which I have given make the maxim res ipsa loquitur applicable. In the following cases that maxim was applied, and the obligation was placed upon the defendant of explaining the cause of the

accident: The fall of a fare register in the defendant's car. Wier v. Union R. Co., 112 App. Div. 109, 98 N. Y. Supp. 268. The breaking of a plank. Madden v. Hughes, 104 App. Div. 101, 93 N. Y. Supp. 324. The giving way of a grating over a sidewalk below the defendant's show window. Weber v. Lieberman, 47 Misc. Rep. 593, 94 N Y. Supp. 460. The breaking of a steel hawser. Duhme v. Hamburg-American Co., 107 App. Div. 237, 94 N. Y. Supp. 1102; Hill v. Starin, 65 App. Div. 361, 73 N. Y. Supp. 91. The breaking of an electric light wire. O'Leary v. Glens Falls El. & G. Light Co., 107 App. Div. 505, 95 N. Y. Supp. 232. The breaking of one of the rounds of a ladder. Cummings v. Kenny, 97 App. Div. 114, 89 N. Y. Supp. 579. The fall of a chimney. Travers v. Murray, 87 App. Div. 552, 84 N. Y. Supp. 558. The falling of weights used to counterbalance the car of a passenger elevator. Griffen v. Manice, 166 N. Y. 188, 59 N. E. 925, 52 L. R. A. 922, 82 Am. St. Rep. 630. The falling of a rod due to the breaking of a chain supporting a bridge. Bartnik v. Erie R. R. Co., 36 App. Div. 246, 55 N. Y. Supp. 266. The falling of an upper berth. Horn v. New Jersey Steamboat Co., 23 App. Div. 302, 48 N. Y. Supp. 348. The breaking of a span wire of an electric road. Jones v. Union R. R., 18 App. Div. 267, 46 N. Y. Supp. 321. The fall of a pile of baggage higher than a man's head. Horowitz v. Hamburg-American P. Co., 18 Misc. Rep. 24, 41 N. Y. Supp. 54. The fall of an iron bar from an elevated railroad structure. Hogan v. Manhattan R. R., 149 N. Y. 23, 43 N. E. 403. The commissioners of the reservation in their letter to the Governor of the state, dated July 9, 1907, and contained in their twenty-fourth annual report to the Legislature, in reference to this accident, state:

"So far, and after a careful examination, no specific reason can be given for the breaking of the cable and the accident happening." Page 283.

When the state engages in the business of a common carrier, it must maintain and operate a suitably and properly equipped road. It must take proper care to prevent accidents, to see that its machinery and appliances are reasonably safe for the purposes for which they are used, and to introduce and use such improvements in its machinery and apparatus as have been found naturally to contribute to safety, the same as other common carriers of passengers for hire. Where the accident is one which would not have happened but for want of proper care, it is incumbent on the defendant to show he has taken such care as prudence would require. Axlebrood v. Rosen, 21 Misc. Rep. 352, 47 N. Y. Supp. 164. A railroad company is liable for any injury resulting from its negligence to introduce any improvement in its apparatus which is known to have been tested and found naturally to contribute to safety. Flinn v. Cent. R., 67 Hun, 631, 22 N. Y. Supp. 473; Reise, Ultra Vires, § 635. The neglect of a railway company to introduce an improvement which is known would naturally contribute to safety, and the adoption of which is in its power, will render the company liable to damages to a person injured. Smith v. New York & Harlem R. R. Co., 19 N. Y. 127, 75 Am. Dec. 305; Costello v. Syracuse, B. & N. Y. R. R. Co., 65 Barb. 92. The commissioners, in their annual report referred to, state:

"The accident at the incline railway on July 6, 1907, referred to in the superintendent's report, was a lamentable verification of the warnings of this commission and its pleadings for an adequate appropriation to replace the antiquated means of communication between the upper level of Prospect Park and the edge of the water below. We frankly stated that the danger line of economy had been reached, and expressed the hope that means might be supplied to keep unbroken the previous record of safety to human life."

If my view of this case be correct, it will be unnecessary to analyze the different opinions and the conflicting theories of the experts, or weigh the contradictory testimony. By the application of common experience and observation to a few of the admitted circumstances and proven facts, a satisfactory conclusion can be reached. The state had on its south-bound car, at the time of the accident, an alleged safety device. This device was made of cast iron, and it had been used and subjected to wear and waste for 20 years. It had been exposed to the weather and to atmospheric deterioration for that period. The only record of its ever having been tested was when it was put on, 20 years before the accident. It is matter of common knowledge that steel or wrought iron is stronger and more durable than cast iron. One would presume that such an apparatus so used and so exposed to weather conditions had nearly run its life after the lapse of 20 years. Yet in May, 1907, its use was resumed without any actual test being made of its strength, capacity, durability, or efficiency. The accident demonstrated it was defective somewhere or somehow, for it did not hold the car. If it had been tested, its weakness, defect, or impairment might have been discovered and remedied.

But the accident happened; the old untested apparatus did not withstand the strain; it was insufficient; it did not hold the car; it broke—and the car fell to the bottom of the incline. To use and keep in operation a device or apparatus upon which the safety of human life depends for 20 years, without its being frequently or properly tested as to its continued strength and efficiency to meet the purposes for which it was being used, is not such reasonable care as a prudent man should take to guard the safety of those intrusted to his care and protect them from injury. The manila rope had been used since June, 1906, except during the winter months when the road was temporarily condemned; and during that time it was exposed to the atmospheric conditions which prevailed at the Falls—the wet, spray, and dampness incident to the location. The rope of 1906, which broke, had a less number of yarns to the strand than the cables of 1905–04. The witness from the rope manufacturing firm stated that the average strength of the yarns of the 1906 rope was about 119 pounds to each yarn. If the yarns in the preceding cables of 1905–04 were the same as in the rope of 1906, and the cables of 1905–04 had more yarns of the same strength than the rope of 1906, then it is apparent from this statement that the cables of 1905–04 must have been stronger than the rope of 1906. The rope was put in use again in May, 1907, after it had been exposed to the weather during the winter. It was worn in places, in one spot the difference in circumference being $2\frac{1}{8}$ inches at the time of the accident. It was frayed in places and was wrapped with burlap; and in practically this condition it was put in commission in May, 1907,

with no test being made to demonstrate its strength, capacity, or deterioration. Perchance, again, if it had been tested, the weak spot where it broke on July 6, 1907, might have been discovered. Observation shows that a rope is seldom used at present for such purposes, and that a steel cable would have been better, stronger, and more durable.

The superintendent of the manufacturing firm testified that in his opinion the rope had been willfully cut, or had been broken by some sharp instrument. If this theory be adopted, then it is unanswerable that, if a steel cable had been used, it could not have been cut and probably not broken by any ordinary sharp instrument. When human life might be placed in jeopardy, or sacrificed, it was not prudent to use a rope in such a condition, or to continue its use without having it tested to ascertain its textile strength and its capability to perform its work during the ensuing season. On July 6, 1907, the manila rope broke, the safety appliance did not work, the device on the car did not hold it, it also broke, and the cars fell to the bottom of the incline. One passenger was killed and three others injured. There was fault or defect somewhere. There was weakness or deterioration at some place. Truly, "the antiquated means of communication" had proved obsolete and insufficient, "the previous record of safety" had been broken, for three passengers were seriously injured, "the danger line of economy" had been reached; aye, it had been passed, for a human life was sacrificed.

I am of the opinion that the facts and circumstances show the state was at fault, and, under the authorities previously cited, was negligent, and is liable for the damages sustained by the persons who were injured.

Judgment for claimants.