ALECIA M. C. VOGEL, Claimant, *v.* STATE OF NEW YORK, Defendant.
(Claim No. 30600.)

Court of Claims, September 26, 1953.

*Carleton G. Eldridge* for claimant.

*Nathaniel L. Goldstein, Attorney-General* (*Donald C. Glenn* of counsel), for defendant.

YOUNG, J. The Belleayre Mountain Ski Center is a ski resort owned by the State of New York and operated and maintained by its Conservation Department. Among its facilities is a chair lift, a device for transporting skiers upmountain. During the summer, the lift is used to carry sightseers.

The lift is about 3,000 feet in length, rising in elevation 784 feet, and consists of a series of chairs suspended about 75 feet apart from a continuous cable. An engine at the bottom of the slope supplies motive power to the cable causing the chairs to travel at a speed of about 500 feet per minute. The usual procedure during skiing hours is to have the cable moving continuously with skiers sitting on and alighting from the chairs while they are in motion.

A safety bar, like that on a Ferris wheel seat, extends across the arms of each chair. It opens from the right to the left. Attached to the same shaft as the safety bar, and moving with it, is another horizontal bar called the ski rest.

To use the lift, a skier purchases a group of tickets, surrendering one at the beginning of each ride. He stands in position, holding his ski poles in the right hand, and when the chair reaches him, he sits down and pulls the safety bar closed. This action brings the ski rest into position beneath his skis. The chair, as it leaves the loading station, rises about thirty feet above the ground and it remains at a considerable height until it reaches the unloading platforms, of which there are two, the intermediate station and the summit.

The intermediate station is a platform about seventy feet in length, and, when a chair arrives at this platform, it descends to an elevation of about twenty inches. An attendant is stationed at the downhill edge of the platform to guide each chair from the left while the skier alights to the right. About four feet from the attendant is a cut-off switch, to which a rope is attached. When the rope is pulled, the engine stops and the chairs come to rest within approximately fifteen feet.

Approaching the intermediate station, there are three signs directing passengers:

> " APPROACHING INTERMEDIATE STATION
> GET OFF FOR LESS DIFFICULT TRAILS "

> " INTERMEDIATE STATION
> OPEN SAFETY BAR NOW TO GET OFF "

> " DON'T DRAG SKI POLES "

As the chair reaches the intermediate station, the skier must open the safety gate which in turn swings the ski rest out of position to the left. The skier must then step forward and to the right out of the chair. The chair continues on past the skier and upmountain.

On March 4, 1950, the claimant, a young lady attorney, accompanied by some friends, went to Belleayre to ski. Belleayre's particular attraction for her was the chair lift, because, even though she had skied for three years and was classed as an intermediate skier, she had never been on one.

She purchased some tickets, went to the loading platform of the chair lift, and then proceeded to practice the preachments of every attorney — extreme caution. Instead of immediately embarking on the lift, she stood at the base of the slope and watched its operation for about thirty or forty minutes. She observed how others got on and rode. She quizzed her friends about its operation and was assured by them that it was " simple ". Being thus instructed and assured, she took her position in the waiting line to take her first ride. From this point on, everything she did appears to have been wrong.

When it came her turn to ride, claimant, carrying her poles in her left hand, took a seat in the moving chair. A loading attendant shouted that her poles were in the wrong hand. Looking up the slope ahead of her, she could see that the others appeared to have their poles across their laps, with the handles to the right and the points to the left. Following their example, she shifted her poles, continuing the while up the hill toward the intermediate station.

Approaching the intermediate station, she prepared to alight by opening the safety gate and calling out " Intermediate Station, please ".

When claimant arrived at the platform, the attendant started to guide her chair from the left and she started to leave it to the right. She then discovered that she had permitted her ski poles to become lodged in the chair in some manner and that she was unable to disengage them. Trying to free the poles, the chair bumping her from the rear, claimant became panicky, her co-ordination deserted her, and she threw herself to the right.

The attendant, seeing and appreciating her plight, pulled the cut-off switch. The chair came to a stop a few feet upmountain from the claimant *with the poles still entangled in it.* In the meantime, the claimant, having lost her balance, fell to the ground and fractured her leg, for which injury, suit is brought.

The claimant, while conceding proper construction and maintenance of the chair lift, alleges that the accident was caused solely by the failure of the attendant on duty at the intermediate station to properly assist her in alighting from the chair. This allegation is broadened by the claimant's argument that reason-

able precaution demanded two attendants, one on either side, to assist those getting off the lift. The suggestion is also made in the testimony that the State failed to properly instruct those inexperienced in riding the lift.

Because of its unfamiliarity with the sport of skiing in general and the operation of ski lifts in particular, the court is appreciative of the lucid manner in which the case was presented at the time of trial and by briefs. The motion pictures of the lift, introduced by the State, were especially helpful to the court in arriving at an understanding of its operation.

The claimant argues that the chair lift is a common carrier within the definition set forth by *Anderson* v. *Fidelity & Cas. Co.* (228 N. Y. 475), in that it is a conveyance offered to the public for hire at a fixed fare for all, and that a duty exists to provide a safe place for alighting. (*Williams* v. *Long Is. R. R. Co.*, 294 N. Y. 318.)

" A common carrier of personal property is one who agrees for a specified compensation to transport such property from one place to another for all persons that may see fit to employ him. (*Jackson Architectural Iron Works* v. *Hurlbut,* 158 N. Y. 34; *Stevenson & Co.* v. *Hartman,* 231 N. Y. 378, p. 381.) One is not a common carrier unless he indicates to the public that he is ready and willing to do business for all that may see fit to employ him ' up to the capacity of his facilities.' (*Michigan Commission* v. *Duke,* 266 U. S. 570, p. 577; 2 Parsons on Contracts [9th ed.], 166.) " (*Gerhard & Hey, Inc.,* v. *Cattaraugus Tanning Co.,* 241 N. Y. 413, 417.) Evolution has brought the definition to include the carrying of passengers as well as goods (*Anderson* v. *Fidelity & Cas. Co.,* 228 N. Y. 475, 492, 493, *supra*) and the definition has been further delineated over the years when the courts have ruled out various supposed criteria. For example, fixed termini are not essential (*Anderson* v. *Fidelity & Cas. Co., supra*); nor are fixed charges (*Jackson Architectural Iron Works* v. *Hurlbut,* 158 N. Y. 34); it matters not whether the transportation be vertical or horizontal (*Griffen* v. *Manice.* 166 N. Y. 188).

The factor which distinguishes the common carrier from others is that he holds himself out to the public " ' *in common,* that is, to all persons who choose to employ him, as ready to carry for hire ' ". (*Allen* v. *Sackrider,* 37 N. Y. 341, 342.) Even the word " all " has its exceptions. One instance is that a common carrier is not required to carry a passenger who is so intoxicated or otherwise disorderly as to endanger the safety of the other passengers or to cause them annoyance or incon-

venience. (*Putnam* v. *Broadway & Seventh Ave. R. R. Co.,* 55 N. Y. 108.)

" ' It would seem that in every case of general obligation to serve, the custom of service qualifies the nature of the duty.' " (*Anderson* v. *Fidelity & Cas. Co.,* 228 N. Y. 475, 491, *supra,* quoting Columbia Law Review, Dec., 1917, pp. 710, 713). This case thus expresses recognition of the fact that every common carrier's obligation to serve all must be qualified by reasonable regulation else its service would be destroyed.

The State of New York, as part of its commendable effort to provide its people with parks and recreational areas, has developed, promoted and advertised its Belleayre Mountain Ski Center. High among its attractive features is the chair lift, which, as we have stated, was the compelling attraction for the claimant, and, we can well imagine, for many others.

The service offered by the chair lift is transportation of passengers for which a fee is charged. It is immaterial to argue that the main concern of the center is downhill skiing and not uphill transportation, as it is not necessary that the exclusive business be carrying. (*Jackson Architectural Iron Works* v. *Hurlbut,* 158 N. Y. 34, 37, *supra.*)

The service is offered to the public " in common ", subject, we assume, to the reasonable qualification that, in wintertime, each passenger must be equipped for skiing, although the evidence is silent on that point. From our understanding of the testimony, there are apparently no qualifications in summer, when sightseers are carried on the lift, even children in a parent's arms.

While " Definitions are fundamental ", and " Their application to any given state of facts, therefore, must be by analogy " (*Anderson* v. *Fidelity & Cas. Co.,* 228 N. Y. 475, 481, *supra*), a factual situation analogous to the one at hand is not readily found. The case appears to be one of first impression both in the country and the State.

In *Burke* v. *State of New York* (64 Misc. 558) the transportation concerned was that provided by an inclined railway running from a lower level to an upper level in a State park at Niagara Falls. It is of interest to know that there was little difference, mechanically speaking, between the railway cars suspended from and moved by the cable and the chairs suspended from and moved by the ski lift cable, except that the railroad car did not hang freely in the air but moved along a track built along or up from the ground.

In the *Burke* case, the court held, at pages 579–580: " The State owned and operated the inclined railway at the time of the accident. It placed placards announcing the railway, notices calling attention to it and the amount charged to ride thereon, thereby inviting the public to patronize it and to pay for the transportation. The State had ticket offices for the sale of tickets to ride on the railway, with its employees to sell the tickets, to receive the sum charged and to collect the tickets sold. The State maintained the structure, provided the cars and appurtenances and the machinery which ran the cars. Its employees operated it, and its officers had the care, control and management of it. It received the fruits from operating it, the receipts from it were turned into the State treasury. Any person who bought and received a ticket was entitled to ride thereon as a passenger. This made and constituted the State a common carrier of passengers for hire and subjected it to the duties and liabilities attaching to such carriers."

*People ex rel. Kelly* v. *Public Service Comm.* (171 App. Div. 810) concerns a privately owned elevator carrying passengers for hire from one street level to another. This case did not apply the common-law definition of common carrier, and it held only as a matter of statutory construction that such a device was not a common carrier within the definition of the then entitled Public Service Commissions Law.

An elevator operated, without charge, in a privately owned building for the public's use was deemed not to be a common carrier. (*Griffen* v. *Manice,* 166 N. Y. 188, *supra.*) In some jurisdictions it has been held that an escalator is a common carrier. (*Weiner* v. *May Dept. Stores Co.,* 35 F. Supp. 895; *May Dept. Stores Co.* v. *McBride,* 124 Ohio St. 264; *Petrie* v. *Kaufmann & Baer Co.,* 291 Pa. 211; see annotation, 152 A. L. R. 562.) No such holding has been made in New York, where, as far as definition of liability is concerned, an escalator has been treated in the same manner as a stairway. (*Glennon* v. *James McCreery & Co.,* 271 App. Div. 977, citing, among other cases, *Serlin* v. *City of New York,* 266 App. Div. 668, affd. 291 N. Y. 595.) " With the development in traveling facilities from the post horse to the chaise, the stage coach and to the modern railroad train or steamboat, the term ' common carrier ' has been applied to each new development catering to the public generally, and the strict rules of the old law have been relaxed but little, for with the development came new dangers of a mechanical sort inherent to swiftly moving machines." (*Anderson* v. *Fidelity & Cas. Co.,* 228 N. Y. 475, 480, *supra.*) The

court then (in 1920) forecast application of the term " common carrier " to " that most recent device for eliminating the fetters of distance, the aeroplane ".

The greatly expanded interest in skiing in recent years is known to all. Practically every population area in the snow belt has its own resorts, be they publicly or privately owned. Thousands take to the slopes every weekend in season. No more is heard the lament that it takes but two minutes to go down a hill that has taken twenty minutes to climb. The time for ascending and descending has been practically equalized by the installation of various devices to whisk the skiers up the slope, and, undoubtedly, there will be more complex devices to come. Some of these, such as the chair lift, have reached the stage where they physically carry the skier and, so to speak, isolate him from his own resources. The revenue, derived from the fares charged, is considerable and is a determinative economic factor in the operation of the ski area. Some concern must be shown for the welfare of the skiing public and indeed for the entire public, if these devices are to be also used by sightseers. The time has arrived when such transportation devices should be scrutinized by the courts and the concern which the operators must show be defined.

The court can only conclude that the facts herein fit the definition and that the State of New York, in operating the chair lift, is a common carrier, and subject to the concomitant duties of care.

The duty owed by a common carrier of passengers is to use the utmost foresight as to possible dangers and the utmost prudence in guarding against them. (*Deyo* v. *New York Central R. R. Co.*, 34 N. Y. 9.) This includes making provision for the passenger to safely alight. (*Fagan* v. *Atlantic Coast Line R. R. Co.*, 220 N. Y. 301.) " The degree of care to be exercised is commensurate with the danger to be avoided ". (*Richardson* v. *Nassau Elec. R. R. Co.*, 190 App. Div. 529, 531.) " It is obvious that all of the varying circumstances must be taken into consideration. The character and mode of the conveyance is a matter playing its part." (Warren on Negligence [1941 ed.], Vol. 2, § 43, par. 6, p. 108.)

That the State appreciated it had a duty varying with the circumstances is evidenced by the fact that while it was customary to allow skiers to alight from the chairs while they were moving, a chair was always stopped when, in the summer, it was ridden by a parent carrying a child.

It is a manifest impossibility for the operator of a ski resort to oversee and classify for his own protection the ability of every skier who may come to ski on his slope. Consequently, he must rely on each skier's being a competent judge of his own abilities. Certainly, the operator cannot be responsible for the broken neck of the novice, who, overestimating his competence, scorns the gentle slopes and tries the ski jump. Judge GIBSON says, in *Wright* v. *Mt. Mansfield Lift* (96 F. Supp. 786, 790), skiing is a " sport that requires an ability on the part of the skier to handle himself or herself under various circumstances of grade, boundary, mid-trail obstructions, corners and varied conditions of the snow. Secondly, it requires good judgment on the part of the skier and recognition of the existing circumstances and conditions. Only the skier knows his own ability to cope with a certain piece of trail."

Likewise, the skier should bring to the riding of the chair lift the same degree of facility with skis that he employs in going down the hill. Barring any hidden defects or latent dangers, the skier who judges himself capable of skiing down a mountain from an intermediate station or the summit, must also judge himself capable of riding on a lift up to that station and alighting from a chair moving 500 feet a minute. If his talents fail him, through overconfidence or through no one else's fault, he alone must suffer the consequences.

In the instant case, the speed at which the lift was moving was obvious to the claimant. It was also obvious to her that she would have to alight from the chair while it was moving, and this with a pair of steel-edged boards strapped to her feet and carrying a pair of poles in her hand. The question which presented itself to her was simply whether or not she had the ability to do it. She gauged the situation for herself, assessed her own ability, was reassured by her friends and made her own decision.

Concerning this there is no quarrel. Claimant argues that being classified an intermediate skier, she did have the ability and that as far as obvious hazards were concerned, she did gauge the situation correctly. The negligence alleged was not that the lift did not transport her to the intermediate station in proper fashion but that she was not properly assisted when she arrived there.

Moving pictures showing the operation of the lift and riders alighting at the intermediate station indicated clearly to the court that any attendant stationed on the passenger's right at the intermediate station would have been a hindrance rather

than a help. Each passenger must get off the chair to the right and his way must be clear to do it. The stationing of an attendant there would have resulted only in a jockeying for position between that attendant and the passenger, with the chances of injury greatly increased.

As for the attendant on the left, his assistance to the passenger could only consist in holding the chair momentarily. He could not directly assist the alighting passenger as he was separated from her by the moving chair itself. Any attempt by him to stand at the left and then run around the chair to the right to lend assistance would have been ineffectual because the passenger would undoubtedly have been off by the time he arrived. This would also have necessitated his leaving the emergency switch, which was placed at the left out of the way of the riders.

The court feels the State exercised the highest degree of care. Any hazards inherent in riding the lift were obvious to all. The signs posted were not a necessary, but merely an added, precaution. The attendant service provided was as sufficient as the mode of transportation and the surrounding circumstances permitted. About the only thing not done was to stop each chair to let the skier alight. We do not feel that the State was called upon to do this as it could rely on the skier's ability to execute this simple maneuver, proof of the pudding lying in the fact that this was the first such accident in thirty thousand rides.

The proximate cause of the accident was the claimant's own negligence in permitting her poles to become entangled in the chair. Reasonable prudence should have suggested that she make certain the poles were free before she attempted to alight. If she then found she could not free them, the attendant could have, and undoubtedly would have, stopped the chair. As it happened, she apparently never gave a thought to the poles until she started to alight, and the attendant took the only course of action open to him.

The claim is dismissed.