Alexander Del Gtorno, J.
This is a claim to recover damages for personal injuries sustained by claimant as a result of the alleged negligence of the State of New York. The claim has not been assigned in whole or in part.
On August 6, 1955, claimant visited the Belleayre State Park, at Highmount, New York, where there is located what is known as the Belleayre Chair Lift, which is maintained by the State for use by skiers during the Winter and by sightseers during the Summer. Accompanying him were his wife, his son, aged 5 years, and a friend, Mr. Ingberg, with his family. Claimant purchased tickets for the climb up the mountain for himself *472 and Ms son. He stood in line and when his turn arrived, he waited on the loading platform with his son in his arms to be loaded into one of the chairs. He testified that the platform he stood on was one yard square. Claimant is five feet seven inches in height.
The chairs on the lift were suspended by a bar from a cable, were 70 feet apart and were in constant motion. These chairs could swing freely from right to left and from front to back. On the left side of each chair was a safety bar and footrest, all in one piece. When open, the safety bar extended out from the front of the chair parallel to the left side of the chair; when closed, it formed a right angle with the left side of the chair. At both the upper and lower loading platforms the footrest, whether the safety bar was opened or closed, was several inches from the ground; as to the chairs when they were swinging and when the safety bar was open, they tilted back to prevent people from falling out.
The claimant, with his child in his lap, rode to the top and alighted from the chair with the help of an attendant. He went sight-seeing, had a soda and signed the log. While there, he met a Mr. Friedensohn, whom he knew. As he was waiting on the platform for the descent, facing down, he testified that he was struck on the back of the right leg and thrown bodily into the chair travelling downward. He claims that he was given no instruction as to how to stand on the platform but that he merely followed the crowd and stood as others did. He did not see what struck Mm, except that the impact threw Mm off Ms feet and he was cast into the chair at the moment of contact. Claimant was not cross-examined by the State on the question of the cause of the accident.
The claimant sustained a spiral fracture of the lower portion of the right fibula from wMch he has completely and fully recovered and now has a normal functioMng extremity with no residual disability. The parties stipulated that the spiral fracture would reasonably have disabled claimant from pursuing Ms normal occupation for a period of four months and further resulted in a partial disability for one additional month; that claimant was confined to his home for four months; that an injury of tMs type can reasonably be caused by a blow; that such an injury is reasonably productive of pain; that the doctors’ bills amounted to the sum of $334.25. A diathermy macMne which was rented cost the sum of $27.75; the hospital bill amounted to the sum of $20. Claimant testified that his average earmngs were $700 per month. A copy of his Federal income tax return for the year 1954 indicates that Ms gross profit on *473 sales as a diamond dealer was $7,843.82 and that in the year 1955 his gross profit from sales was $6,335.17.
The witness Arthur G. Draper, Superintendent at Belleayre, testified that people were permitted to carry in their laps children not over six years of age. He described the lift as containing 85 to 90 chairs on a constantly moving endless chain, and the chairs as being about 20 inches wide; when the bar is open it is 18 inches to 20 inches to the outside of the frame of the chair. He stated that the loading platform is 18 inches in width and 2 feet in length. Normally an empty chair would have the safety bar open, as left by the prior passenger; if it were closed the attendant would open it. The hanger grip is so designed as to permit the chair to swing from side to side and from front to back; if a chair were to swing too much, i.e., 4 inches, the attendant stops it. The attendant, however, has the duty of guiding the chair to the waiting patron. He testified further that if a person is standing on the platform waiting, there is normally nothing that would strike him on the right foot; that the only way in which a patron would be struck would be in a situation where the chair and footrest swung in an arc to the right, but even then that would be apt to hit a person higher on his body than in the instant case. Further, he stated that if the footrest were open before striking, it would close upon striking with the result that it would be impossible for the patron to sit in it. He testified that only if the shaft of the footrest had struck claimant could it have remained open. In describing the operation of the lift in the summertime, Mr. Draper testified that it runs at a speed of about 3 or 4 miles an hour; that the attendants collect tickets, instruct the waiting patrons to look for approaching chairs and to sit immediately as the chair nears; that if a chair swings forward or sideways, the attendant takes hold of the chair and steadies it; that the place in which to stand is marked by footprints on the platform, but that if the patron is not in that exact position the attendant pulls the chair laterally around the patron into a position where he can sit in it; that when the chair is at the loading platform, the point of the footrest would be 5 inches from the ground; that in the Summer of 1954 there were 28,000 passengers, with no accidents to his knowledge. He further testified that when the attendant steadied the chair he guided it to the rear of the patron who would fall into it in a sitting position, thus preventing the chair from hitting the patron; that a patron facing downhill normally would be to the left of the chair; that sometimes an attendant may hold the chair with one hand on the safety bar and the other on the back of the chair, and in *474 such case, if he were to swing the chair into the patron the safety bar could remain open.
The State introduced into evidence moving pictures of the loading operation. These indicate that the chairs may swing from side to side and from front to back, that the platform is a mere board upon which to stand, that the attendant operates the chair in loading and unloading passengers and that the footrest normally is close to the left side of the standing patron.
The witness George Ingberg substantiated the testimony of claimant and testified further that when he saw claimant descending 30 minutes after the ascent, the latter shouted to the attendant that he was hurt, at which time the cable was stopped. Mr. Ingberg helped the attendant remove claimant from the chair and asked the attendant where there was a first-aid station. Upon being informed that there was none, he took claimant to a doctor at Fleischmanns, then to a hospital and then back from the hospital to New York.
Testifying later on behalf of the State, the witness Draper stated that on April 8, 1958, he had measured various distances, finding that the distance between the platform and the point of the chair footrest is 14 inches and the shaft 5 inches; that the platform is 24 inches wide; that in 1954 there had been one reported accident on the chair lift during the Summer, and in 1955 none. He admitted that the chairs can be tipped, although attendants are instructed specifically not to do so.
William L. Harris, an engineer employed by J. Boebling & Sons, the firm which designs and furnishes the material for the chair lifts, testified that for the past 10 years he has inspected chair lifts at Belleayre and other places. He testified that it is not customary for each passenger to be given instructions as to how to board the lift; that customarily the passenger stands on the platform and the attendant guides the chair to him; that it is possible for the chair to be moved in such a way that a standing passenger could be hit on the right side, but that the person could be struck in a place lower than the right calf and that in such case, if the safety bar were closed, the person could not be seated; if the safety bar were open, however, the passenger could be struck and also seated. He stated that if a person were careless, he could drag his foot along the ground while he was being seated.
James 0. Smith, an attendant on the chair lift since 1950, and on duty on the date of the accident, testified that he did not swing the chair in which claimant sat, and that if a passenger were in a wrong position, he could and would swing the chair around him and wait for the nest chair, 68 feet away.
*475 The State moved to dismiss at the end of claimant’s case and renewed its motion at the close of the entire case; decision on both motions was reserved.
In order to determine the degree of care to be exercised by the State toward passengers in the operation of the chair lift, the status of the State must be considered. Claimant maintains that the State was a common carrier. A common carrier of goods is one who, by virtue of his calling, undertakes, for compensation, to transport personal property from one place to another for all who may choose to employ him, and every one who undertakes to carry for compensation all persons indifferently is, as to liability, to be deemed a common carrier. (Anderson v. Fidelity & Cas. Co., 228 N. Y. 475.)
In the Anderson case, decided in the year 1920, the court, commenting upon progress in methods of transportation said (pp. 480-481): “ With the development in traveling facilities from the post horse to the chaise, the stage coach and to the modern railroad train or steamboat, the term 1 common carrier ’ has been applied to each new development catering to the public generally, and the strict rules of the old law have been relaxed but little, for with the development came new dangers of a mechanical sort inherent to swiftly-moving machines. (Palmer v. Prest., etc., D. & H. Canal Co., 120 N. Y. 170; Ingalls v. Bills, 9 Metc. 1; Hegeman v. Western Railroad Corpn., 13 N. Y. 9.) Today, as is practically conceded by counsel for both parties in the instant case, the terms ‘ common carrier ’ should be applied to the ‘ jitney bus,’ and to-morrow, in a proper case, it may well be that it may be applied to that most recent device for eliminating the fetters of distance, the aeroplane, presenting as it does new dangers unknown to the average man which can only be decreased by a high degree of care upon the part of those in control of the mechanism which operates them.”
The difference between a common carrier and others is that he holds himself out to the public 11 in common, that is, to all persons who choose to employ him, as ready to carry for hire ’ ’. (Allen v. Sackrider, 37 N. Y. 341, 342.) In Burke v. State of New York (64 Misc. 558) the court held, at pages 579-580: “ The State owned and operated the inclined railway at the time of the accident. It placed placards announcing the railway, notices calling attention to it and the amount charged to ride thereon, thereby inviting the public to patronize it and to pay for the transportation. The State had ticket offices for the sale of tickets to ride on the railway, with its employees to sell the tickets, to receive the sum charged and to collect the tickets *476 sold. The State maintained the structure, provided the ears and appurtenances and the machinery which ran the ears. Its employees operated it, and its officers had the care, control and management of it. It received the fruits from operating it, the receipts from it were turned into the State treasury. Any person who bought and received a ticket was entitled to ride thereon as a passenger. This made and constituted the State a common carrier of passengers for hire and subjected it to the duties and liabilities attaching to such carriers.” Here, the service offered by the chair lift is transportation of passengers for which a fee is charged. The service is offered to the public “ in common ”. The revenue obtained from the operation of the chair lift is that of the State, which operates it for the purposes of receiving such revenue.
The State suggests that making use of the chair lift is different from riding in a taxicab, bus or train, and is to be placed upon a footing similar to 1‘ riding a merry-go-round, steeple chase, roller coaster or similar device ”, becoming rather an “uncommon carrier”. The court does not subscribe to this theory. The purpose of using the lift was to be taken to the top of the mountain and not primarily to be amused or thrilled in the ascent thereto. Today different methods of transportation are becoming more and more varied. Years ago the airplane was only a dream, but when it became a reality resulting eventually in mass air transportation, the rights of passengers had to be fixed and the concept of the common carrier extended. Today the operation of this chair lift by the State, hitherto unthought of, requires the determination by the court of the status of its passengers.
The court finds that the State was a common carrier in the operation of the chair lift.
The duty owed by a common carrier of passengers is to use the utmost foresight as to possible dangers, and the utmost prudence in guarding against them. (Deyo v. New York Central R. R. Co., 34 N. Y. 9, 11.) “ The degree of care to be exercised is commensurate with the danger to be avoided ’ ’. (Richardson v. Nassau Elec. R. R. Co., 190 App. Div. 529, 531.)
Claimant, in attempting to prove that the State has breached a duty owing to him, invokes the res ipsa loquitur doctrine. The purpose of this rule is to aid a claimant in sustaining the burden of making out a prima facie case in order to avoid a motion to dismiss at the close of claimant’s case. It “ relieves a plaintiff from the burden of producing direct evidence of negligence, but it does not relieve a plaintiff from the burden of proof that the person charged with negligence was at fault * * * *477 ‘ * * * It requires evidence wMch shows at least probability that a particular accident could not have occurred without legal wrong by the defendant ’ * * * ‘ The doctrine merely means that certain occurrences contain within themselves a sufficient basis for an inference of negligence, and it does not differ from ordinary cases of circumstantial evidence except in the respect that the facts and circumstances from which the inference of negligence is drawn are immediately attendant on the occurrence. ’ ” (Foltis, Inc., v. City of New York, 287 N. Y. 108, 115, 116.) The doctrine applies where there is control by the person charged with negligence and there is improbability of the occurrence having happened if he had been reasonably careful. ‘ ‘ It is familiar law that in applying the doctrine of res ipsa loquitur there is required proof ‘ of absence of any action on the part of the plaintiff contributing to the accident. Its purpose, of course, is to eliminate the possibility that it was the plaintiff who was responsible. * * # The plaintiff is seldom entirely static, and it is not necessary that he be completely inactive, but merely that there be evidence removing the inference of his own responsibility.’ (Prosser on Torts [2d ed.] p. 208.) ” (Minotti v. State of New York, 6 A D 2d 990.)
Claimant testified that he stood on the loading platform and waited for the chair to approach him from his rear. He looked over his right shoulder, saw the chair coming toward him, then looked downhill and next felt the blow on the back of his right leg. Mr. Draper, the Superintendent of the park, testified that it was the duty of the attendants to guide the chair into a position, since the chair swung from side to side. He stated further that the chair can be tipped, though attendants are instructed not to do so. The claimant made out a prima facie case and it became the obligation of the State to come forward with an explanation of the accident so as to overcome the implication resulting from the proof of claimant.
The motion pictures of the loading operation introduced by the State show that the chair may swing from side to side and from front to back and that the attendant operates the chair in loading and unloading passengers. The footrest normally is close to the left side of a patron who is standing. The witness Harris testified that if a person were careless, he could drag his foot along the ground while he was being seated. The witness Smith testified that he did not swing the chair in which claimant sat. What the State has done is to offer an inference that the claimant caught his foot under the footrest as he sat down in the chair. The evidence in the record is that of claimant *478 who testified that he was struck in the rear of the right leg and precipitated into the chair.
The State has failed in its duty to offer an adequate explanation of the accident.
The court awards to the claimant for the personal injuries sustained by him the sum of $3,000; for loss of earnings the sum of $2,500; for medical expenses the sum of $380, amounting in all to the sum of $5,880.
All motions heretofore made by the State on which decision was reserved are hereby denied.
This constitutes the decision of the court in accordance with the provisions of section 440 of the Civil Practice Act.
Let judgment be entered accordingly.