## No. 21886.

Summit County Development Corporation, Trygve Berge, and Sigurd Rokne *v*. Ceil Bagnoli.

(441 P.2d 658)

Decided May 27, 1968.     Rehearing denied June 17, 1968.

28

Sheldon and Nordmark, Richard C. McLean, for plaintiffs in error.

James W. Wilson, Philip Hornbein, Jr., for defendant in error.

*In Department.*

Opinion by Mr. Justice Hodges.

Mrs. Ceil Bagnoli, plaintiff below and hereafter referred to as plaintiff or by name, sustained a spiral fracture of the right leg when she fell while attempting to board a chair lift at a ski area near Breckenridge, Colorado. At the time of the accident, plaintiff was receiving ski instruction from Walter Olsen, an employee of the Peak-8 Ski School. Plaintiff filed this action in the trial court for damages proximately caused by the alleged negligence of Trygve Berge and Sigurd Rokne, operators of Peak-8 Ski School, and Summit County Development Corporation, operators of the Breckenridge ski facility under a Special Use Permit granted by the United States Forest Service.

Trial was to a jury which returned a verdict in favor of the plaintiff, and assessed her damages at $8,000. Judgment was accordingly entered against Berge, Rokne, and the Summit County Development Corporation, who will be referred to herein as defendants or by name. These defendants bring this writ of error and claim that in several respects, the trial court committed prejudicial error. The assignments of error which we deem to be meritorious will be discussed after a recitation of the facts and a description of the facilities are outlined to an extent required for an adequate understanding of the issues involved.

The evidence shows that Summit County Development Corporation and Peak-8 Ski School were independent entities and that Summit leased the Breckenridge facilities to the school. The school received its income from the sale of ski instruction services to skiers at Breckenridge and had no interest in the proceeds of chair lift tickets sold separately by Summit to skiers who desired to take advantage of the lift to the upper slopes.

Summit was responsible for the operation of the chair lift equipment. Each chair, wide enough to seat two persons, was suspended by a pivotal bar attached to an overhead continuous cable which moved over and through groove type pulley wheels attached to terminal ends of cross arms mounted on large circular steel pillar-type towers in line with the boarding area and the unloading areas higher on the mountainside. The maximum speed of these chairs was five hundred feet per minute, but this speed could be substantially decreased or entirely stopped for the convenience of novice skiers, or in the event of an emergency. An operator controlled the speed of the chairs from his position near the skiers' boarding area, which was marked by a board in the snow and extended two or three feet on either side of the board in line with the overhead cable. To board the ski lift, no more than two skiers would simply approach the boarding area, stand side by side, position themselves directly under the cable with their skiis parallel to the cable and in the path of the moving chairs, hold their poles in the inside hand, watch for the approaching chair over the outside shoulder and seat themselves upon the chair when it came to them from behind.

At a point ten to fifteen feet ahead of the boarding area, the cable angled upward from almost horizontal alignment. The area below sloped sharply downwards. This sloping area or dropoff was referred to as the "abortion ramp," the purpose of which, theoretically, was to permit a skier who fails to become properly

seated to jump or fall down in this area and out of the way of the following chairs.

Mrs. Bagnoli, plaintiff, age 49, and her teen-aged daughter, Diane, were inexperienced skiers, but desired to learn skiing fundamentals at Breckenridge. They each purchased ski instruction tickets from Peak-8 Ski School entitling them to lessons for a half-day. The School instructor, Walter Olsen, advised the plaintiff and her daughter that it would be necessary to purchase chair lift tickets, due to insufficient snow at the base of the mountain on which to practice. They purchased lift tickets and returned to their instructor. When Diane was prepared to ski, Olsen accompanied her to the boarding area and they boarded a chair and ascended the mountain. Although plaintiff had ample opportunity to watch the chair lift in operation while waiting for Olsen to return, the evidence shows that at least during part of this waiting period she was absorbed in adjusting her skiing equipment. Olsen returned within ten minutes and prepared to board the chair lift with the plaintiff. She confided that she had skied only once previously and that she was unsure of her ability to use the lift. She further testified that Olsen reassured her by telling her she would be all right. Olsen instructed her briefly, which in effect generally was, that she should hold her ski poles in the one hand and watch over the opposite shoulder for an approaching chair.

According to plaintiff's testimony, she had positioned herself with Olsen near the moving line of chairs, and, while momentarily involved with removing her ski pole straps from over her wrists, Olsen said: "Follow me. We'll take this one." She stated that she followed Olsen onto the boarding area and that the approaching chair swung against her backside, throwing her down the abortion ramp and causing the fracture to her right leg. Other testimony indicates that she did get seated or became partially seated and then stiffened into a stand-

ing or partial standing position before going down the abortion ramp.

Plaintiff's theory of the case was that defendants Berge and Rokne, through their employee Olsen, negligently and carelessly failed to instruct her and to assist her in mounting the ski lift in a safe and proper manner and that defendant Summit was a common carrier with respect to plaintiff, and thus owed the plaintiff the highest degree of care commensurate with the practical operation of the chair lift. The defenses asserted were: that plaintiff was instructed in proper use of the lift and hazards incident thereto; that plaintiff assumed the risk of such hazards and the risk of the injuries and damages complained of and that her injuries were proximately caused by her own sole or contributory negligence.

I.

The defendants contend that prejudicial error was committed by the trial court when it refused to instruct the jury on the defense theory of assumption of risk.

It is basic that a trial court should instruct on a defense theory only when there is evidence to support it. It is obvious from our examination of this record, that the evidence which the defendants emphasize as being in support of an instruction on assumption of risk is essentially evidence of possible contributory fault on the part of the plaintiff, and the jury was adequately instructed on the defense of contributory negligence. In our view, therefore, the trial court's refusal to instruct on the doctrine of assumption of risk was proper.

To premise an assumption of risk instruction, the evidence should reflect that the plaintiff had an awareness or knowledge of a risk and assumed it by participating in the activity involved. Knowledge and appreciation of the risks are the key elements. These were not shown to have existed on the part of the plaintiff, nor were the risks of such an obvious nature that it could be said that she should have known of

them. Admittedly, the plaintiff was a ski novice with no experience in boarding or riding a ski lift. She had placed herself in the care of an instructor with the reasonable expectation that she could depend upon him for guidance and instruction on how to board and ride the ski lift. Neither her testimony or other evidence indicates that she had any awareness of any unreasonable danger inherent in boarding the ski lift, nor under the facts here is it evident that any inherent risk was indeed involved, except perhaps to a novice who would attempt the boarding procedure without the advice and assistance of an experienced person.

██ We recognize the confusion inherent in some negligence cases where both contributory negligence and assumption of risk defenses have been asserted. This problem and the relationship between these defenses is discussed in *Appelhans v. Kirkwood*, 148 Colo. 92, 365 P.2d 233. The facts of that case, although dissimilar from the facts before us, do demonstrate that one of the distinguishing features of assumption of risk is a matter of knowledge of the danger and the intelligent acquiescence in it by an injured claimant. The defense of contributory negligence does not include these elements. In *Appelhans*, we quoted with approval the following statement from W. Prosser, The Law of Torts 305 (2d ed. 1955) to show the differences between these defenses:

" '... In working out the distinction, the courts have arrived at the conclusion that assumption of risk is a matter of knowledge of the danger and intelligent acquiescence in it, while contributory negligence is a matter of some fault or departure from the standard of reasonable conduct, however unwilling or protesting the plaintiff may be. The two may coexist, or either may exist without the other. The difference is frequently one between risks which were in fact known to the plaintiff, or so obvious that he must be taken to have

known of them, and risks which he merely might have discovered by the exercise of ordinary care.' "

See also *Cox v. Johnston*, 139 Colo. 376, 339 P.2d 989 wherein we held that for one to be charged with assumption of risk he must be conscious of a risk knowingly undertaken.

The extent of the knowledge of the risk which is required before the assumption of risk doctrine is applicable is well defined in Restatement of Torts (2d) § 496D as follows:

"Except where he expressly so agrees, a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character."

In the case before us, there is no basis for charging the plaintiff with knowledge that the defendants would fail to exercise due care for her safety or give her the instructional advice or guidance necessary to forestall harm during the period of time she was with her instructor. The trial court therefore properly refused to give an assumption of risk instruction to the jury.

## II.

Defendants contend that paragraph 57 of the Special Use Permit granted by the United States Forest Service should not have been admitted into evidence because the requirements imposed were immaterial to defendants' duties of care and it was prejudicial. Paragraph 57 provides:

"The permittee is authorized to conduct a ski school with headquarters at Breckenridge. The head of the ski school authorized by this permit shall have passed the Ski Instructors' Qualification Test given by the Certified Ski Instructors, Inc., for the Southern Rocky Mountain Region or by any similar group for the National Ski Association. Other instructors in the ski school, if not certified, shall give instruction only under his immediate supervision."

Defendants' instructor, Walter Olsen, had not passed

the Ski Instructors' Qualification Test as required, although he had been certified by the Norwegian Ski Federation.

The trial court construed paragraph 57 as designed to protect the public from incompetent instruction, and to assure that ski students at Breckenridge would learn the sport of skiing from individuals familiar with proper instructional technique. Obviously, the trial court felt that proper instructional technique included a teaching knowledge on how to properly use a ski lift, as an integral part of the sport of skiing. Any assumption as to what precautionary requirement may be encompassed within this provision cannot obviously be a basis for its admission into evidence.

In our view, paragraph 57 should not have been admitted into evidence. It was not only irrelevant and immaterial to the issue of the defendants' negligence as alleged but it was prejudicial to their case. As the evidence is postured here, there is no showing that the defendants violated the provisions of this paragraph, and we add, that because of ambiguous wording and its lack of specificity as to the exact precautions required, it would have been impossible to conclude that the defendants did not abide by its provisions. Even if the evidence indicated some lack of compliance, such a violation in our view would have been not only abstract, but remote to the issue of the defendants' negligence as alleged. Abstract violations, whether statutory or arising independently of statute, which do not possess legal relevancy, can only serve to confuse and mislead a jury.

Challenged paragraph 57 sets forth two requirements, to wit:

1. That the head of the school must have met the qualifications specified, and

2. That instructors must also be qualified in the same manner, or if not, they must give instruction under the immediate supervision of the head of the school.

One of the owners of the school had been qualified as required at the time of the accident, but the other owner defendant had not. Did this violate paragraph 57 in the minds of the jury? It may have. The giving of skiing lessons by an uncertified instructor under the immediate supervision of the head of the school is, in our view, susceptible to several interpretations. The evidence reflects that Instructor Olsen was not certified, however, this was not a violation of the precautionary requirements of paragraph 57 unless it was shown that at the time of the accident, he was not instructing under the immediate supervision of the head of the school. But what exactly is meant by immediate supervision, without further explanation in paragraph 57, is a matter of conjecture. For example, the jury could well have reasoned that this meant that the certified head of the ski school was required to be in immediate attendance during instruction by an uncertified instructor and that therefore, there was a failure to take the precautions required. This, or other meanings, could be indulged in.

Because of the ambiguity of paragraph 57, it may have communicated to the jury a precautionary requirement more stringent than the duty of care properly chargeable to the defendants. On this basis, it was clearly inadmissible. Furthermore, it was prejudicial to the defendants' case because its receipt into evidence may well have placed in the minds of the jury a predisposition that the evidence revealed a violation of its provisions when, in fact, no violation was established nor could it be clearly established because of its ambiguity and lack of specificity.

There is presented here a secondary issue of whether provisions of a public contract relating to the contractors' care and precautions to be taken for the benefit of third persons are ever admissible in tort actions brought by third persons as evidence to show what the standard of care is under the circumstances shown. This

court has not previously had occasion to pass on this narrow issue.

In *Lewis v. La Nier*, 84 Colo. 376, 270 P.656, this court reviewed the trial court's refusal to admit into evidence the defendant contractors' agreement with the State of Colorado, wherein the defendants agreed to maintain barriers and warning lights in the vicinity of its highway construction project. Plaintiff's decedent had been fatally injured when the automobile in which he was a passenger veered from the defendants' unlighted barricade and overturned, The trial court's refusal to admit the provisions of the contract was upheld against plaintiff's contention that the contract established her right to sue as a third party beneficiary, and that the contract provisions established defendants' duty of care. We there held only that plaintiff had a statutory right to sue independent of the contract, and that the "measure of the defendants' duty in this case is to be determined by the law governing negligence cases, not by the provisions of the contract." This holding consequently does not answer the question presented in the instant case, namely, whether the contract's safety provisions, though not supplanting the common law standard of due care, would be admissible as evidence of what the standard of due care would be under the circumstances shown.

Authorities from other jurisdictions are sharply divided on this question. We believe, however, that the better-reasoned view, supported by the weight of recent authority, is that safety provisions in public contracts should be admissible along with other evidence in tort actions to assist in determining the standard of care. See, *e.g., Fluor Corporation v. Black,* 338 F.2d 830 (9th Cir.); *Davis v. Nelson-Deppe, Inc.,* 91 Idaho 463, 424 P.2d 733; *Foster v. Herbison Construction Co.,* 263 Minn. 63, 115 N.W. 2d 915; *Larson v. Heintz Construction Co.,* 219 Ore. 25, 345 P.2d 835.

The duty in negligence actions remains one

of exercising due care, and due care depends upon the attendant circumstances. A public contractors' express agreement to take specific precautions is one of the attendant circumstances to be considered in determining the standard of care in a particular case providing the specific precautions required do not establish a higher duty of care than required by the common law. One of the governing objectives in incorporating safety provisions into its public contracts is to define particular hazards associated with the enterprise and to assure that the contractors employ appropriate safeguards with respect to those hazards. It is basic and elementary, however, that before such a provision of a public contract can be received into evidence, the required precautions must be specific, clearly itemized and unambiguous. Paragraph 57 falls far short of meeting these standards.

Accordingly, on the basis of the several reasons discussed herein, we hold that paragraph 57 of the Special Use Permit by the United States Forest Service to the defendants was inadmissible and that the trial court committed prejudicial error by receiving it into evidence.

### III.

Defendants contend that Instruction No. 15 was in error because the jury was instructed that Summit County Development Corporation was a common carrier and owed the highest degree of care to plaintiff. In giving this instruction, the trial court applied, in part, the rationale of *Lewis v. Buckskin Joe's, Inc.*, 156 Colo. 46, 396 P.2d 933, to the facts and circumstances surrounding plaintiff's use of the ski chair lift.

In *Lewis*, the jury was instructed only as to duty of ordinary care but we therein held that the facts of that case dictated an instruction placing a duty on the defendants to exercise the highest degree of care commensurate with the practical operation of the stagecoach, and that it was not important whether defendants were

serving as a *carrier* or engaged in activities for amusement. In that case, we applied the following rationale: "The important factors are, the plaintiffs had surrendered themselves to the care and custody of the defendants; they had given up their freedom of movement and actions; there was nothing they could do to cause or prevent the accident. Under the circumstances of this case, the defendants had exclusive possession and control of the facilities used in the conduct of their business and they should be held to the highest degree of care, . . ."

Although the "important factors" in *Lewis*, *supra*, are not fully present in the instant case, nevertheless, in our view, a ski lift facility, like other transportation facilities, and like the stagecoach amusement ride in *Lewis*, *supra*, requires the operator to exercise the highest degree of care commensurate with its practical operation.

This is the first occasion we have had to consider the degree of care required of a ski lift operator. We have noted in other jurisdictions where the sport of skiing has also become highly popular, courts have imposed on ski lift operators a common carrier status, thus requiring that a higher degree of care be exercised in the operation of this type of facility. See *Grauer v. State of New York*, 181 N.Y.S.2d 994; *Vogel v. State*, 124 N.Y.S.2d 563; and *Fisher v. Mt. Mansfield Company, Inc.*, 283 F.2d 533, (2d Cir.).

Because of the existence of the above described rule of *Lewis*, *supra*, and the nature and purpose of our statutes pertaining to common carriers at the time of this accident, there was no need to designate the ski lift operator as a common carrier in Instruction No. 15. However, this is of no consequence, since the paramount purpose of Instruction No. 15 was to convey to the jury the rule of law that a chair ski lift operator must exercise the highest degree of care commensurate with the practical operation of the ski lift. It accomplished that

purpose. The defendant's contention that the giving of this instruction constituted prejudicial error is rejected.

IV.

The defendants sought to introduce into evidence a movie film of the ski lift in operation. The purpose of the exhibit was to show the technique used in boarding a chair lift and to show how the lift operates. After viewing the film several times, the trial court refused its admission into evidence on the ground that an adequate foundation was not laid; that the film was not taken under controlled circumstances; that the film was taken about one year after the accident; and that there was no adequate showing that the speed of the moving equipment as shown in the film was the same as when the plaintiff was injured. Defendants claim that the movie film was properly admissible to illustrate the testimony of various witnesses as to how the chair lift is boarded and that their case was prejudiced by the court's refusal to admit this exhibit.

The film in question was viewed by this court during oral argument. It was taken at a time when snow conditions were good and it shows a number of skiers boarding the lift with much ease. At least one of the purposes of this film, as shown from the record, was to promote and publicize the Breckenridge ski area.

One of the foundations which must be laid prior to admitting photographic evidence is that the conditions depicted are substantially unchanged from the time of the event at issue. *Fox v. Martens*, 132 Colo. 208, 286 P.2d 628 and *Parris v. Jaquith*, 70 Colo. 63, 197 P.750. However, a variance in conditions not material to the purpose for which the photographic evidence is offered, and which does not unduly prejudice the objecting party, should not preclude its admissibility.

The question to be resolved therefore is whether the basic physical differences between the accident scene and the film scene, and whether the juxtaposition of the skiers in the film and the plaintiff at the accident scene,

present such material differences as to be unduly prejudicial to the plaintiff.

Admittedly, the movie film did not depict the same snow conditions which prevailed at the time of the accident when the area was muddy and slushy. There is also a dearth of evidence as to the speed at which the lift was being operated when the accident occurred as compared to its speed as shown on the movie film. It furthermore showed to advantage the ease with which the chair lift was boarded by the skiers who were portrayed. Such a showing under ideal conditions may well have unduly prejudiced the plaintiff who was described in the evidence as a novice with no experience in boarding a ski lift.

It is generally recognized that the question of the sufficiency of foundation proof to show that a photograph or a movie film is a fair or accurate representation of the objects or situations which it purports to portray is a matter largely within the discretion of the trial court. In our view, the trial court did not abuse its discretion in refusing to admit this exhibit into evidence.

As stated previously, the trial court's admission into evidence of paragraph 57 of the Special Use Permit constituted prejudicial error. Accordingly, the judgment is reversed and the cause is remanded for a new trial.

MR. CHIEF JUSTICE MOORE and MR. JUSTICE DAY concur.